**TYLENA M. and Latisha M., by their mother Debra M., Plaintiffs,**

v.

**HEARTSHARE CHILDREN'S SERVICES, Eleanor Poole, Rosalyn Chernofsky, Vincent Adrien, Marilyn DeSevo, Brooke Trent, City of New York, Defendants.**

No. 02 Civ. 8401(VM).

United States District Court, S.D. New York.

Sept. 19, 2005.

Carolyn A. Kubitschek, Lansner & Kubitschek, New York, NY, for Plaintiffs.

John B. Higgins, Murphy & Higgins, L.L.P., New Rochelle, NY, Suzanne M. Halbardier, Barry, McTiernan & Moore, New York, NY, for Defendants.

### DECISION AND ORDER

MARRERO, District Judge.

Plaintiffs Tylena M. ("Tylena") and Latisha M. ("Latisha") (together, "Plaintiffs"), through their adoptive mother, Debra M., filed this action pursuant to 42 U.S.C. § 1983 (" § 1983") against Heartshare Children's Services ("Heartshare"), the City of New York (the "City"), and several of Heartshare's and the City's employees (collectively, "Defendants"). The complaint alleges that Defendants failed to protect Tylena and Latisha from abuse while they were in the custody of the City and Heartshare as foster children.

Plaintiffs assert five causes of action against the City and/or certain of its employees: (1) that the City, Vincent Adrien ("Adrien"), during the relevant time a caseworker for the City's Child Welfare Administration ("CWA"), presently known as the Administration for Children's Services ("ACS"), and Marilyn DeSevo ("DeSevo"), Adrien's supervisor during some of the relevant time, deprived Plaintiffs of their liberty and privacy and of their right to be free from unjustified intrusions on their personal security, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, by improperly supervising Plaintiffs and failing to protect them from abuse while they were in government-supported foster care; (2) that the City and Brooke Trent ("Trent"), who served as director of CWA during part of the relevant time, deprived Plaintiffs of their liberty and privacy and of their right to be free from unjustified intrusions on their personal security, in violation of the Fifth and Fourteenth Amendments to the United States Constitution, by improperly training the City's foster care employees; (3) that the City, Adrien, DeSevo, and Trent acquiesced in the use of excessive force against Plaintiffs, in violation of the Fourth and Fourteenth Amendments; (4) that the City, Adrien, DeSevo, and Trent failed to exercise the highest degree of reasonable care during their supervision of Plaintiffs by failing to protect them from abuse; and (5) that Adrien and DeSevo violated their obligation to carry out social work duties in a competent, professional manner and that, as a result, Plaintiffs were subjected to repeated physical, sexual and emotional abuse.

Defendants have moved for summary judgment. By Decision and Order dated October 25, 2004, the Court denied summary judgment with respect to Plaintiffs' claims against Heartshare and its employees (the "Agency Defendants"). The Court now considers the summary judgment motion filed on behalf of the City and its employees (the "City Defendants").

For the reasons stated below, that motion is granted in part and denied in part.

Also before the Court is Plaintiffs' motion pursuant to Fed.R.Civ.P. 11 ("Rule 11") and 28 U.S.C. § 1927 for sanctions to be imposed against the Agency Defendants and their attorneys, Murphy & Higgins. Plaintiffs' motion is based on the allegation that the motion for summary judgment filed by the Agency Defendants and their attorneys was frivolous. For the reasons stated below, Plaintiffs' Rule 11 motion is denied.

## I. FACTUAL BACKGROUND [1]

CWA removed Tylena and Latisha from the custody of their biological mother on or about August 9, 1988 and January 27, 1989, respectively, and placed them in foster care. At the time of their placement in foster care, Tylena was one year and eight months old and Latisha was less than one month old. CWA took this action in response to substantiated allegations that their birth mother was using crack cocaine and allowing Tylena to be sexually abused.

CWA placed Tylena and Latisha under the direct supervision of Heartshare, formerly known as the Catholic Guardian Society, a not-for-profit corporation authorized by New York Social Services Law to provide foster care services. Heartshare in turn placed Tylena and Latisha in the home of Ora Heathington ("Heathington"), a certified foster parent. The children's primary caretaker at the Heathington home was Heathington's daughter, Monique Vizcarrando ("Monique"). Monique's husband, Jose Vizcarrando ("Jose"), also resided in the Heathington home.

Plaintiffs allege that, while residing in the Heathington home, they were repeatedly beaten and locked in closets for long periods of time. They further allege that Jose repeatedly raped Tylena, attempted to rape Latisha, and forced both children to perform oral sex on him. Plaintiffs allege that this abuse occurred over a period of more than two years.

On August 5, 1991, plaintiff Debra M., Tylena's and Latisha's maternal aunt and now adoptive mother, brought the children to the Harlem Hospital because Latisha was complaining of pain in her vaginal area. A doctor there examined Latisha and determined that she had been sexually abused. Both children were admitted to the hospital for sexual abuse treatment. The City's Office of Confidential Investigations investigated the incident and concluded that both Latisha and Tylena had been sexually abused by Jose. After their admission to the Harlem Hospital on August 5, 1991, the children did not return to the Heathington home. On November 7, 1991, they were placed in the home of Debra M.

## II. LEGAL STANDARDS

### A. SUMMARY JUDGMENT

In order to prevail on a motion for summary judgment, the moving party must demonstrate that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

---

1. Except where otherwise noted, the following factual summary is based on the undisputed factual allegations of the parties set forth in their pleadings, Rule 56.1 statements and papers submitted in connection with the instant motion.

L.Ed.2d 202 (1986). In determining whether genuine issues of material fact exist, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). The nonmovant, however, cannot create a genuine issue of fact through "conclusory allegations, conjecture and speculation." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

### B. *LIABILITY UNDER § 1983*

■ Section 1983 creates a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The Second Circuit has held that, "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." *Doe v. New York City Dep't. of Social Services,* 649 F.2d 134, 141 (2d Cir.1981). In particular, "children in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm." *Marisol A. by Forbes v. Giuliani,* 929 F.Supp. 662, 675 (S.D.N.Y.1996).

■ In order for a governmental custodian to be held liable under § 1983 for the nonfeasance of affirmative duties to those in its custody, two requirements must be satisfied: (1) "the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest;" and (2) "the officials in charge of the agency being sued must have displayed a mental state of 'deliberate indifference' in order to 'meaningfully be termed culpable' under § 1983." [2] *Doe,* 649 F.2d at 141 (citing *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976); quoting *Turpin v. Mailet,* 579 F.2d 152, 166 (2d Cir.1978)).

**2.** Plaintiffs argue that the Court should apply a less strict standard of liability based on the holding of the United States Supreme Court in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), which was decided after *Doe.* In *Youngberg,* the Court held that a mental health professional could be held liable for failing to provide adequate care to a mentally retarded adult residing in a government institution only if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." 457 U.S. at 323, 102 S.Ct. 2452. The Second Circuit has interpreted this standard of liability to "require ... less than deliberate indifference." *Kulak v. City of New York,* 88 F.3d 63, 75 (2d Cir.1996). Neither the Second Circuit nor the Supreme Court has addressed whether the *Youngberg* standard should be applied in cases alleging a failure to properly supervise children in foster care.

Plaintiffs argue that the principles underlying the holding in *Youngberg* support application of the "professional judgment" standard to the instant case. The Court rejected a similar argument in *Daniel H. v. City of New York,* 115 F.Supp.2d 423 (S.D.N.Y.2000). In that case, the Court determined that, "[b]ecause *Doe* has not been overturned by the Supreme Court and still appears to set forth the relevant standard, ... the more rigorous constitutional standard" still should be applied in evaluating § 1983 claims concerning foster children. *Daniel H.,* 115 F.Supp.2d at 430. Accordingly, the Court concluded in that case that the defendants "must have displayed a mental state of deliberate indifference in order to be liable under Section 1983." *Id.* There is no basis on which to reconsider that ruling here, as the Court remains bound by the Second Circuit's holding in *Doe.*

## III. DISCUSSION

### A. SECTION 1983 CLAIMS AGAINST THE CITY AND THE CITY EMPLOYEES IN THEIR OFFICIAL CAPACITY

■■ To the extent that Plaintiffs' claims are asserted against the City itself, they require proof that "the entity's policy or custom played a part in the violation of federal law." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991). Plaintiffs' claims against the individual defendants in their official capacity also require such proof because "[a] Section 1983 suit against a municipal officer in his official capacity is considered a suit against the municipality itself...." *McInnis v. Town of Weston*, 375 F.Supp.2d 70, 86 (D.Conn.2005) (citing *Brandon v. Holt*, 469 U.S. 464, 472, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985)).

#### 1. Failure to Supervise

■■ Municipal policymakers may be held liable in their official capacity under § 1983 for a failure to supervise if they "should have known that inadequate ...

supervision was 'so likely to result in the violation of constitutional rights, that [they] ... can reasonably be said to have been deliberately indifferent to the need.'" *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). Plaintiffs argue that the City's policies concerning the supervision of children in foster care were conducive to violations of constitutional rights.[3] The crux of Plaintiffs' claim in this regard is that the "City defendants established no mechanism by which to ensure that the information provided [to the City] by the [foster care] agency [concerning the welfare of children in foster care] was complete or verify that it was accurate." (Plaintiffs' Response to City Defendants' 56.1 Statement, dated November 30, 2004 ("Pls.' 56.1 Statement"), at 3.) As the City Defendants explain, New York "Social Services Law contemplates the use of private agencies to provide direct services [to children in foster care] under contract with the City of New York." (City Defendants' Reply Memorandum of Points and Authorities, dated December 30, 2004 ("Dfs.' Re-

---

**3.** Plaintiffs claim that the City Defendants failed in their duty to supervise Tylena and Latisha, rather than in their duty to supervise City or contract agency employees. *See* Complaint ¶¶ 39, 41. Claims pursuant to § 1983 based on an alleged failure to supervise, however, generally concern a failure to supervise municipal employees. The standard test for liability for a failure to supervise employees requires a showing that: (1) the defendant knows "'to a moral certainty' that her employees will confront a given situation;" (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation;" and (3) "the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of New York*, 974 F.2d 293, 297–298 (2d Cir.1992) (citing *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct.

1197, 103 L.Ed.2d 412, (1989)). The leading Second Circuit case dealing with § 1983 claims against a city for failing to protect foster children from abuse, *Doe*, formulates the failure to supervise claim, which in that case was asserted against a private foster care agency rather than against the City, as the failure to supervise the foster care "placement." *Doe*, 649 F.2d at 137. *Doe* was decided before *Walker* and does not employ its test for evaluating liability based on a failure to supervise. Because the claims at issue in *Doe* are more similar than those at issue in *Walker* to the claims at issue here, the Court follows the analysis set forth in *Doe*, which focuses on whether the defendant's acts or omissions were "a substantial factor leading to the denial of a constitutionally protected liberty or property interest" and whether the defendants "have displayed a mental state of 'deliberate indifference.'" *Doe*, 649 F.2d at 141 (citations omitted).

ply Mem."), at 1 (citing N.Y. Soc. Serv. L. § 371.10).) While the City thus delegates responsibility for the provision of direct foster care services to private entities, this delegation does not absolve the City of its ultimate responsibility to ensure that children in its custody receive adequate care and protection from harm.[4] *See Amnesty America v. Town of West Hartford,* 361 F.3d 113, 126 (2d Cir.2004) ("[A]llowing delegation, without more, to defeat municipal liability would contravene the remedial purposes of § 1983."); *Covington v. Westchester County Jail,* No. 96 Civ. 7551, 1998 WL 26190, at *3 (S.D.N.Y. Jan.26, 1998) (quoting with approval statement by the Eleventh Circuit Court of Appeals that a government's obligation to provide medical care to incarcerated individuals "is not absolved by contracting with [a private entity].... Although [the private entity] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the policies or customs of the [the private entity]. In that sense, the county's duty is non-delegable.") (quoting *Ancata v. Prison Health Servs. Inc.,* 769 F.2d 700, 705 (11th Cir.1985)).

In light of the City's retention of this ultimate responsibility for care and protection, the factual issue of whether the City had any means of verifying the accuracy or ensuring the completeness of the information provided by private foster care agencies concerning the welfare of children under their direct supervision is material to Plaintiffs' § 1983 claim. If there existed no means, or insufficient means, for the City to corroborate its contract agencies' own representations concerning the welfare of children in their custody, then the City's delegation of responsibility to such agencies for the provision of direct services to foster children arguably would be tantamount to an impermissible or unreasonable delegation of the City's ultimate obligation for the welfare of those children.

It is undisputed that the City monitored foster care placements by requiring employees of the private agencies with which it contracted for direct foster care services ("agency caseworkers") to submit reports, called uniform case records ("UCRs"), to the City every six months. Plaintiffs contend that the UCRs were constitutionally inadequate because they "did not ask foster care agencies for basic information on the health or safety or daily care of foster children." (Plaintiffs' Memorandum of Law in Opposition to City Defendants' Motion for Summary Judgment dated November 30, 2004 ("Pls.' Mem.") at 15.) The City Defendants dispute this characterization of the UCRs. The Court's own review of the UCRs submitted by the parties reveals that, while the questions asked by the UCRs may prompt some agency caseworkers to provide information concerning the "health or safety or daily care" of the children, the UCRs do not contain specific questions concerning these matters.[5]

---

4. The City's recognition of this principle is reflected in its Agreement for Purchase of Child Welfare Services from the Catholic Guardian Society, dated January 27, 1989 (attached as Ex. 44 to the Declaration of Carolyn A. Kubitschek, dated November 30, 2004 ("Kubitschek Decl.")), which states: "It is recognized and agreed by the parties hereto that the Commissioner has the ultimate responsibility for the protection and preservation of the welfare of each child receiving services under this Agreement."

5. The UCRs instruct agency caseworkers to "[w]rite a narrative reassessment which describes changes in family situation and summarizes family's current functioning." (UCR dated July 9, 1991 (attached as Ex. 55 to Kubitschek Decl.).) In cases where a child has been placed in a foster home, the UCRs instruct agency caseworkers to describe the child's "adjustment to foster care." (*Id.*) The UCRs also instruct the agency caseworker to "summarize the nature of the interaction between the participants during the casework

Even if the UCRs did specifically require or could reasonably be read to request such information, though, such a requirement would not address Plaintiffs' primary contention—that the City's policies did not provide any means by which the information provided in the UCRs could be verified by the City or by any interested third party with sufficient standing. In support of this claim, Plaintiffs cite to the deposition of non-party Diana Cortez ("Cortez"), who was employed as a Borough Manager by ACS at the time of her deposition. Cortez affirmed that "once a child was placed with a foster agency and [the City's Office of Contract Agency Case Management ("OCACM") ] was assigned to the case, ... all the information that ACS or OCACM would receive on the child would come from the foster care agency in the form of a UCR or written communication." (Deposition of Diana Cortez, October 9, 2003, at 16 (attached as Ex. 34 to Kubitschek Decl.).) Cortez further stated, in response to the question "[h]ow did OCACM workers ensure that the information being provided by the foster care agency was true," that they "have to rely on the information received on paper," presumably meaning the UCR. (*Id.*)

Defendant DeSevo made similar statements in her deposition. In response to the question, "[o]ther than the situation where a foster care worker would call up your caseworker to discuss issues with them, how would you know whether information was discussed fully in the UCR," DeSevo stated: "We wouldn't know." (Deposition of Marilyn DeSevo, September

29, 2003, at 46 (attached as Ex. 36 to Kubitschek Decl.).)

The City Defendants dispute Plaintiffs' claim that there was no mechanism by which to verify or ensure the accuracy of the information contained in the UCRs. They explain that "the contract agency had to include all state-regulated information in the bi-annual uniform case records to report on the health and welfare of the foster children in their care" and that defendant "Adrien or other OCACM workers would also review all documents sent by the agency, call with questions, or respond to agency phone calls, and make sure all legal paperwork was up to date." (City Defendants' Reply Rule 56.1 Statement dated December 30, 2004 ("Defs.' Reply Rule 56.1 Statement") at 7.) None of these practices, however, clearly provides any means of verifying the information provided by the agency caseworkers themselves.

The City Defendants also claim that "the City will reject UCRs which contain inadequate or missing information." (*Id.* at 2.) This statement, however, begs the question how, absent a more particularized reporting requirement, a City employee would know or even suspect that information in a UCR was missing or inadequate. The City further asserts that "in their contract renewals, Heartshare and other contract agencies were evaluated on their compliance with state regulations and the quality of their foster care services." (*Id.*) Again, this statement does not explain how or whether the information agencies reported in the bi-annual UCRs for individual foster children was verified or determined to be complete. At best, the City Defendants' claims create a factual dispute

contacts." (UCR dated January 9, 1991 (attached as Ex. 55 to Kubitschek Decl.).) Neither of the parties specify the meaning of the term "casework contacts," but the responses on this portion of the UCRs submitted to the Court indicate that this term refers to meet-

ings between the agency caseworker, the foster children, the foster parents and the biological parents. The remaining questions on the UCRs concern legal activity in the child's case, and changes in and progress toward the child's "permanency planning goal."

concerning the adequacy of the City's means of monitoring foster care placements.[6]

Plaintiffs further argue that the City's policies caused violations of constitutional rights because they "prohibited City [OCACM] employees from visiting foster homes, speaking with foster parents, attending Service Plan Reviews, or having any communication with foster children," presumably even to respond to allegations of child abuse called to the City's attention directly or those reported to the agencies of which the City became aware. (Pls.' 56.1 Statement at 12.) The City Defendants do not deny that such policies existed at the time that Tylena and Latisha resided in the Heathington home. In addition, Plaintiffs have substantiated these allegations with the deposition statements of individuals with personal knowledge of the City's practices. Adrien, for instance, stated in his deposition that "[i]t's prohibited for the ACS staff to have direct contact with the clients" and affirmed that ACS policy prohibited him from having "face-to-face contact with the foster parents." (Deposition of Vincent Adrien, August 21, 2003, at 86–87 (attached as Ex. 35 to Kubitschek Decl.).)

Accepting as true Plaintiffs' factual allegations concerning the City Defendants' supervision of children placed in foster homes, the Court must determine whether those assertions could reasonably support a finding of deliberate indifference on the part of City policymakers. The Second Circuit has explained that, although "ordinary negligence by itself could not establish a cause of action under [Section] 1983," *Doe*, 649 F.2d at 143, "repeated acts of negligence [can] be evidence of indifference." *Id.* at 142. Evidence of "gross negligent conduct creates a strong presumption of deliberate indifference." *Id.* at 143. The Second Circuit has "often equated gross negligence with recklessness, and [has] defined it as the 'kind of conduct ... where [the] defendant has reason to know of facts creating a high degree of risk of physical harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.'" *Poe v. Leonard*, 282 F.3d 123, 140 n. 14 (2d Cir.2002) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 985 (2d Cir.1991)) (further citations omitted). *See also Doe*, 649 F.2d at 143 n. 4 (Gross negligence is an "indifference to present legal duty and utter forgetfulness of legal obligations, so far as other persons may be affected, [and] a manifestly smaller amount of watchfulness and circumspection than the circumstances require of a person of ordinary prudence.") (quoting *Burke v. Cook*, 246 Mass. 518, 141 N.E. 585, 586 (1923)).

---

**6.** Materials submitted or cited by the City Defendants indicate that agency caseworkers were required to submit psychiatric and medical reports to City foster care workers and that agency caseworkers were required to report suspected abuse to the City's Department of Social Services. *See* 18 N.Y.C.R.R. § 428.3(b)(4)(ii) (indicating that, along with the UCRs, agency caseworkers must submit "all reports of medical or clinical examinations or consultations, including medical examinations and laboratory tests, psychiatric or psychological examinations or consultations (either court-ordered or voluntary)...."); Report of Accident, Illness, or Death involving Child(ren) in Public Care dated May 2, 1991 (attached as Ex. M to Affidavit of Suzanne M. Halbardier dated October 29, 2004 ("Halbardier Affid.")). The City Defendants do not, however, explicitly mention these requirements in their Rule 56.1 statement or their memoranda in support of their motion for summary judgment. In particular, although the City Defendants' Exhibit M indicates that, in May 1991, Poole reported a scratch found on Tylena to the City's Department of Social Services, the City Defendants do not address whether Adrien, DeSevo or Trent ever received or should have received this report, or how the requirement that agency caseworkers file such reports might affect the § 1983 analysis.

 The indifference of policymakers must be "deliberate" in the sense that they "made a 'deliberate choice ... from among various alternatives'...." *Walker v. City of New York,* 974 F.2d 293, 297 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 389, 109 S.Ct. 1197). Deliberate indifference does not, however, require a showing of "ill-will or the affirmative acquiescence in mistreatment." *Doe,* 649 F.2d at 144. In addition, deliberate indifference need not relate to "a known injury" but instead may relate to a "known risk, or a specific duty." *Id.* at 145. Accordingly, municipal officials may be held liable under § 1983 "regardless of whether [they] were aware of the specific deprivations while they were being administered by subordinates." *Doe,* 649 F.2d at 145 (citing *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.1979)).

 Crediting Plaintiffs' representations that the City by stated policy prohibited its workers from having any direct contact with foster children, foster parents, or other adults residing in foster homes, the Court finds that a reasonable juror could conclude that City officials were deliberately indifferent to the risk, created or enhanced by the policy or practices in question, that foster children would be abused in their foster homes. The City Defendants do not dispute that such a risk existed and that City policymakers were

aware of it.[7] Although the City adopted procedures for generally evaluating the performance of foster care agencies and those agencies were subject to state regulations, the record before the Court raises a question of fact as to whether the City enacted adequate procedures by which to verify the completeness and accuracy of information provided to it by agencies about specific individual children in foster care. An affirmative policy prohibiting City OCACM workers from having direct contact with foster children and foster parents, even if at minimum to receive and properly respond to complaints of abuse, reflects a deliberate choice from the alternatives of permitting, requiring, or having no explicit policy concerning such contact. A reasonable juror could interpret the absence of any means of the City going behind a contract agency's own representations, combined with a policy prohibiting employees responsible for oversight of such agencies from having direct contact with foster children and foster parents, to reflect indifference to the risk that foster children might be abused in their foster homes, and hence constitute an impermissible or unreasonable abdication of the City's ultimate responsibility to protect children in its custody from harm.

 To survive summary judgment, Plaintiffs also must demonstrate that there is a genuine dispute concerning whether

---

7. The City Defendants do, however, dispute Plaintiffs' representations regarding the extent of the risk that children in foster care, and in the custody of Heartshare in particular, would suffer abuse. Plaintiffs claim that "from 1988 to 1991, the frequency of abuse of children placed with Heartshare skyrocketed." (Pls.' Mem. at 10.) The City Defendants contest this characterization of the alleged increase in the abuse rate. The document Plaintiffs cite in support of their claim, a Pre Renewal Review Report regarding Heartshare ("Heartshare Report") (attached as Ex. 40 to Kubitschek Decl.), refers to an increase in the

"incident rate of 2.1% of a population of 962" from "the previous year's incident rate of 1.0% of a population of 862." (Heartshare Report at 0110.) The City Defendants point out that the Heartshare Report does not define the term "incident rate" and claim that "in the 1992 Heartshare contract renewal, the number of 'indicated' cases of abuse/maltreatment decreased by 50% between 1990 and 1991." (Dfs.' Mem. at 2.) An "indicated" case is one in which "some credible evidence of the alleged abuse or maltreatment exists." 18 N.Y.C.R.R. § 432.1(g).

the City's policies were "a substantial factor leading to the denial" of Tylena's and Latisha's right to be protected from harm while in the City's custody. *Doe,* 649 F.2d at 141 (citing *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). The Supreme Court has instructed that, for a policymaker's alleged deliberate indifference to be a substantial factor leading to a given violation, the policy at issue must be "closely related to the ultimate injury," and the trial court should inquire whether "the injury [would] have been avoided" had the policy not been "deficient in the identified respect." *City of Canton,* 489 U.S. at 391, 109 S.Ct. 1197.

Plaintiffs contend that "[h]ad the City of New York required, or even permitted its employees to speak to foster children or even review the children's records, City defendants would have learned of the severe risks to Tylena and Latisha's safety in the Heathington home." (Pls.' Mem. at 15–16.) In order for the City's policies to have been causally related to the alleged abuse, it must first be demonstrated that the abuse had been occurring and known or objectively manifest to the agency or reasonably discoverable by the City for a sufficiently long period of time before the children were removed from the Heathington home on August 5, 1991, such that closer monitoring of the placement by the City prior to that date could have detected the alleged abuse.

Plaintiffs claim that Tylena and Latisha were "subjected to repeated sexual, physical, and emotional abuse" "[f]or more than two years." (Pls.' Mem. at 1.) The evidence Plaintiffs cite in support of this claim, however, does not indicate when the alleged abuse commenced. The earliest relevant allegation contained in the materials cited by Plaintiffs is reported in a psychological evaluation dated July 19, 1990. The evaluation, performed when Tylena was approximately three years old, states that Monique had reported that, although Tylena was "presently well adjusted . . ., when first placed in her home, [Tylena] reacted with fear whenever approached for a diaper change," that she had a "woman's rash," and that she "was afraid of [Monique's] husband." (Psychological Evaluation dated July 19, 1990 (attached as Ex. 30 to Kubitschek Decl.).) Because there were substantiated allegations that Tylena had already been sexually abused in the home of her biological parents and because Monique apparently stated that Tylena evinced these symptoms only when "first placed in her home," this report by itself does not constitute clear evidence of abuse occurring in the Heathington home. On the contrary, Monique's claim that Tylena had become "well adjusted" suggests that these signs of abuse had subsided since Tylena had commenced residing in the Heathington home.

Another psychological evaluation, dated May 9, 1991, approximately three months before Tylena and Latisha were removed from the Heathington home, reports that Tylena demonstrated "overwhelming anxiety and tension" and that "[m]aterial with sexual connotations [was] particularly overwhelming" for Tylena. (Psychological Evaluation dated May 9, 1991 at 940 (attached as Ex. 31 to Kubitschek Decl.).) The same evaluation states that, when shown pictures of a mother, father and children, Tylena "described a mother who was going to beat the child on the bottom with a comb for wetting the bed" and "described the male authority figure as a monster." (*Id.*) Despite evidence that Tylena was abused prior to entering the Heathington home, the Court finds that a rational jury could reasonably infer from these statements that Tylena had experienced abuse in the Heathington home, since her comments were made and re-

corded almost three years after Tylena was placed there.

The evidence suggests that other indications of abuse in the Heathington home had also surfaced prior to the August 5, 1991 incident. "Progress Notes" by Heartshare caseworker Eleanor Poole ("Poole") report the following incidents that a factfinder could reasonably interpret as signs of abuse: on February 20, 1991, Poole reported that another caseworker had reported hearing Monique slapping Latisha; on February 21, 1991, Poole reported that she personally observed a burn on Latisha's hand; on May 1, 1991, Poole reported that she had observed Latisha "screaming and patting herself between her legs," heard Tylena state to Monique that she was "not going to let them [8] touch [her]," and observed "a long scratch on Tylena at her nape/hair line" and that, when asked how she got the scratch, Tylena stated that Heathington had "flipped her and ... scratched her." *Id.* Thus, Plaintiffs have presented evidence suggesting that the children were being abused at least several months before they were removed from the Heathington home and that there were observable signs of that abuse that City workers could have detected had they had or been open to any direct contact with the children.

The Court recognizes that "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton,* 489 U.S. at 392, 109 S.Ct. 1197. Nevertheless, the Court finds that in this case the "something" the City could have done was not an isolated, ad hoc action evident or plausible only after the fact, but a longstanding policy or practice which over time could reasonably be deemed to have created or enhanced conditions under which the risk of child abuse became actionably foreseeable. The Court finds that a reasonable juror could conclude from the evidence in the record before the Court that the City's policy prohibiting direct contact with foster children, insofar as it precluded or discouraged reports of abuse that could have prompted remedial measures, was a "substantial factor" leading to the continuation of the alleged violations in this case.[9] Therefore, the City Defendants' motion for summary judgment as to Plaintiffs' claim that the City violated their Fourteenth Amendment right to substantive due process by failing to provide them with adequate supervision is denied to the extent that that claim is asserted against the City

8. Poole's notes do not clearly indicate to whom Tylena was referring in this statement, but the context suggests she was referring to Heartshare employees. In any event, this statement could reasonably be interpreted to suggest a general fearfulness of being touched inappropriately by adults that could have signaled to a reasonable person that further investigation was warranted.

9. In a somewhat analogous context, another court in this District determined that a reasonable juror could find that a county's failure to properly train its employees was a substantial factor leading to constitutional violations. In *Prieto v. County of Orange,* 1997 WL 399662 (S.D.N.Y. July 15, 1997), the court determined that a reasonable juror could find that the county's practice of providing child welfare workers with "very minimal training" on a "difficult and unproven" communication technique for use with developmentally disabled children as a means of investigating reports of abuse "could result in deprivation of the parents' constitutionally protected interest in the care and custody of their children." *Prieto,* 95–cv–003755, 1997 WL 399662, at *5. In *Prieto,* the provision of better training may or may not have prevented the alleged violation. Nevertheless, the court found that improper training had a sufficient causal connection to the alleged violations to survive summary judgment.

and the individual City Defendants in their official capacity.

### 2. Other Claims Against the City and Its Employees in their Official Capacity

■ The above discussion addresses only Plaintiffs' claim under § 1983 that the City Defendants violated the children's constitutional rights by failing to properly supervise them while in foster care. As noted above, however, Plaintiffs also claim § 1983 violations based on the City's failure to train its employees and on its acquiescence in the use of excessive force. The City Defendants do not explicitly argue that summary judgment is warranted with respect to these claims. They do, however, state in their Local Civil Rule 56.1 Statement ("56.1 Statement") that Adrien "received training on the review of UCRs . . . [and] abuse and neglect of children." (Dfs.' 56.1 Statement at 2.) Plaintiffs do not dispute this claim. Nor do they argue in their opposition to the City Defendants' motion that the City failed to provide proper training or that a lack of training was a substantial factor leading to the alleged abuse. Thus, the record before the Court does not reflect a genuine dispute regarding facts material to Plaintiffs' cause of action based on the City's alleged failure to train. Accordingly, Plaintiffs' second cause of action is dismissed.

■ Although the City Defendants state in their notice of motion that they seek dismissal of all claims against them, they do not specifically address Plaintiffs' claim based on alleged acquiescence in the use of excessive force. Nor do Plaintiffs discuss this claim in their opposition to the City Defendants' motion. Nevertheless, because the City Defendants have formally moved for dismissal of the excessive force claim, the Court will address it.

■ "In cases . . . where the alleged excessive force occurred 'outside the context of an arrest,' plaintiff's § 1983 claim is analyzed under the Fourteenth Amendment Due Process Clause." *DeVito v. Barrant*, No. 03–CV–1927, 2005 WL 2033722, at *5 (E.D.N.Y. Aug. 23, 2005) (quoting *Hemphill v. Schott*, 141 F.3d 412, 418 (2d Cir.1998)) (further citations omitted). Plaintiffs do not specify the facts underlying their excessive force claim. The Court presumes that Plaintiffs intend to plead this cause of action against the City Defendants for failing to prevent Heathington, Monique and Jose from allegedly using excessive force against Tylena and Latisha. Although excessive force claims generally allege the use of force by governmental authorities, they may also be brought against public officials for failing to prevent private persons from using excessive force. *See, e.g., Armster v. City of Riverside*, 611 F.Supp. 103, 107 (D.C.Cal. 1985) ("[A] police officer has a duty to intercede to prevent an individual from being subjected to excessive, unlawful physical force regardless of who is applying the unlawful force to the individual. In fact, a police officer may be expected to intercede earlier in such a struggle when a private person is using possibly excessive force . . . .").

The Court further presumes that Plaintiffs' excessive force claim is, like their failure-to-supervise claim, based on the theory that the City Defendants acted with deliberate indifference to a substantial risk that excessive force might be used against Tylena and Latisha in the Heathington home. To the extent that this claim requires the same § 1983 analysis as Plaintiffs' failure-to-supervise claim, and that it appears undisputed that the alleged underlying harm to Tylena and Latisha constitutes "excessive force," the Court denies the City Defendants' motion as it relates to Plaintiffs' excessive force claim against the

City and the individual City Defendants in their official capacity.[10]

▮▮▮▮ Finally, to the extent that Plaintiffs' § 1983 claims are based on alleged violations of the Fifth Amendment, they must be dismissed. As the City Defendants point out, "[b]ecause the Fifth Amendment applies only to the federal government, allegations of 'federal action' are required to state a claim for deprivation of due process in violation of the Fifth Amendment." *Taylor v. Evans*, 72 F.Supp.2d 298, 305 n. 3 (S.D.N.Y.1999) (citation omitted). Plaintiffs do not allege federal involvement in any of their claims. Accordingly, insofar as Plaintiffs' claims are based on the Fifth Amendment, they are dismissed.

B. *SECTION 1983 AND STATE LAW CLAIMS AGAINST DEFENDANTS ADRIEN, DESEVO AND TRENT IN THEIR INDIVIDUAL CAPACITY*

1. *Immunity*

The City Defendants claim that Adrien, DeSevo and Trent are immune from liability for Plaintiffs' claims against them in their individual capacity. The City Defendants do not explicitly distinguish among three distinct types of immunity at issue in the law cited in support of their argument: statutory immunity pursuant to New York Social Services Law Section 419 ("NYSSL § 419"), New York common law immunity, and qualified immunity under federal law.

a. *Immunity from Suit Under § 1983*

The City Defendants' discussion focuses on the federal doctrine of qualified immunity. Pursuant to that doctrine, "[g]overnment actors performing discretionary functions are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir.1995) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Thus, "the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987); *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987)). "The objective reasonableness test is met ... if 'officers of reasonable competence could disagree' on the legality of the defendant's actions." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)).

The Second Circuit has held that "a defendant is entitled to summary judgment on qualified immunity grounds when 'no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not clearly violate an established federally protected right. In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary

---

**10.** Plaintiffs also claim that the City Defendants' alleged acquiescence in the use of excessive force violated Tylena's and Latisha's rights under the Fourth Amendment. As noted above, however, § 1983 claims based on the alleged use of excessive force outside the context of an arrest are to be analyzed under the Fourteenth Amendment. *See DeVito*, 2005 WL 2033722, at *5. Accordingly, the Court does not address Plaintiffs' excessive force claim to the extent that it is pled as a violation of the Fourth Amendment.

judgment." *Id.* (quoting *Robison,* 821 F.2d at 921) (further citations omitted).

 "Since qualified immunity is an affirmative defense, the defendants bear the burden of showing that the challenged act was objectively reasonable in light of the law existing at that time." *Varrone v. Bilotti,* 123 F.3d 75, 78 (2d Cir.1997) (citing *Harlow,* 457 U.S. at 815, 102 S.Ct. 2727). The City Defendants argue that Adrien's conduct was objectively reasonable because "the UCRs submitted by Heartshare did not demonstrate that Tylena or Latisha was the victim of sexual or emotional abuse." (Defs.' Reply Mem. at 9.) In support of this claim, the City Defendants cite the UCRs concerning Tylena and Latisha that Adrien approved in August 1989, February 1990, June 1990, and January 1991. Plaintiffs contend that certain of these UCRs contained information that made it unreasonable for Adrien to believe that his conduct in continuing to approve the Heathington foster home did not violate the children's rights.

First, Plaintiffs point out that the description of "casework contacts" in the February 1990 UCR is identical to that contained in the August 1989 UCR. According to Plaintiffs, this "repetition was a clear indication that the agency defendants were not properly monitoring the foster home but were instead simply recycling information they received six months to a year earlier." (Pls.' Mem. at 5.) The information that appears to have been copied from the earlier UCR, however, which concerns the relationship between the agency caseworker and the foster children, the foster mother, and the biological parents, may simply not have changed considerably during the relevant six-month period. In addition, other portions of the later UCR provide updated information. While the existence of identical language in part of the UCR could reasonably have raised

concerns as to whether the Heartshare caseworker was monitoring the foster home with sufficient diligence, the Court finds that, in light of the nature of the repeated information and the existence of substantial new information in the later report, including indications of thirteen meetings between the agency caseworker and the foster children, no reasonable juror could determine that Adrien's approval of the second UCR was objectively unreasonable.

Plaintiffs also point out that the February 1990 UCR reflected that the Heartshare caseworker had visited the foster home only once during the previous six-month period, while New York State Regulations require two visits. As noted above, though, the UCR indicated numerous other contacts with the foster children. Again, in light of the other information contained in the UCR, the Court concludes that no reasonable juror could find that Adrien's approval of the UCR, even if there had been only one instead of two home visits, was objectively unreasonable.

Plaintiffs also contend that the July 1991 UCR indicated that "the foster mother had begun to lie about information provided by the agency." (Pls.' Mem. at 4.) It appears that Plaintiffs base this claim on the statement in the UCR that the foster mother "denied that she was ever told" that the children might eventually be removed from her home and placed with a relative. (July 1991 UCR at NYC 0149 (attached as Ex. I to Halbardier Affid.).) This statement, however, could reasonably be interpreted to reflect a misunderstanding rather than a lie. The Court finds that no reasonable juror could conclude that Adrien's approval of the UCR containing this information was objectively unreasonable.

Finally, Plaintiffs claim that the July 1991 UCR "detailed the emotional trauma being inflicted upon the infant plaintiffs by

the foster family." (Pls.' Mem. at 4.) In support of this claim, Plaintiffs cite statements in the UCR that Tylena had told her aunt and prospective adoptive mother, Debra M., that Monique had told Tylena not to let Debra M. touch her and that the agency caseworker "sincerely believes that the foster parent are [sic] instilling in the children that they do not like the maternal aunt [Debra M.]" and that "Tylena is very withdrawn ... when Monique is around." (July 1991 UCR at NYC 0150.) Although this information may support a conclusion that the children were experiencing emotional difficulties in the foster home, the same UCR indicates that the children's transfer out of the Heathington home to Debra M.'s home was imminent. (*See id.* at NYC 0151.) Again, the Court concludes that a reasonable juror could not find that it was objectively unreasonable for Adrien to believe that his approval of the UCR would not result in a violation of the children's constitutional rights. Because the Court finds that no reasonable juror could find that Adrien's approval of Tylena's and Latisha's placement in the Heathington home up until their removal on August 5, 1991 was objectively unreasonable, the Court concludes that Adrien is immune from suit under § 1983 based on the federal doctrine of qualified immunity.[11]

11. The Court recognizes the potentially apparent inconsistency between holding, on the one hand, that a reasonable juror could find that the City's policies exhibited deliberate indifference and, on the other hand, that no reasonable juror could find that Adrien, acting in accordance with those policies, engaged in objectively unreasonable behavior. The finding that a given policy could be viewed as reflecting deliberate indifference to the risk of a constitutional violation, however, does not imply that that policy is facially unconstitutional, or that under all circumstances a particular municipal employee would necessarily be unreasonable in performing assigned duties in compliance with it.

The City Defendants also claim that De-Sevo and Trent are immune under this doctrine. The Court, however, need not address this contention in light of its finding, explained below, that there is no genuine dispute as to whether DeSevo and Trent had sufficient personal involvement in the alleged § 1983 violations to be found liable for them in their personal capacity.

b. *Immunity from Suit under State Law Causes of Action*

The Court's findings regarding Adrien's immunity from suit under § 1983 entail that he is also immune from suit under the state law claims pursuant to the New York doctrine of common law immunity. The Appellate Division recently held in *Sean M. v. City of New York,* 20 A.D.3d 146, 795 N.Y.S.2d 539, 548 (App.Div. 1st Dep't. 2005), that the City was not protected by New York common law governmental immunity, "which attaches when the duties of the defendant's position involve 'the exercise of ... discretion and judgment.'" *Id.* at 548 (quoting *Mon v. City of New York,* 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 (N.Y.1991)). The Appellate Division found that the existence of statutory duties owed by the City to children in its care to provide for their safety defeats a claim to common law immunity where it is alleged that the City was negligent in fulfilling those duties.[12] Accordingly, "lia-

In addition, although the City Defendants have not asserted that Adrien's allegedly unreasonable conduct involved the performance of discretionary functions—a prerequisite to the application of qualified immunity—Plaintiffs do not dispute that the conduct at issue involved an exercise of discretion. *But see Barnes v. County of Nassau,* 108 A.D.2d 50, 487 N.Y.S.2d 827, 830 (App. Div.2d Dep't 1985), discussed in footnote 13 below.

12. *Cf. Barnes,* 487 N.Y.S.2d at 829. While the Second Department in *Barnes* also found that "a claim of immunity will not bar inquiry into a county's allegedly negligent placement and supervision of an infant in foster care," *id.,*

bility may be imposed upon a state or its subdivisions for injuries sustained by children due to negligent oversight of the foster homes that care for them." *Id.* at 550.

 The Court interprets this holding to imply that, if there is no basis on which a reasonable juror could find that a defendant municipal worker was negligent in overseeing a foster home, that defendant is protected from personal liability by the New York doctrine of common law immunity. The Court's discussion of Adrien's allegedly actionable conduct above concludes that no rational factfinder could conclude that that conduct was unreasonable. Because a claim based on negligence requires a showing that the defendant failed to act in accordance with the standard of "a reasonable man under like circumstances," *Restatement (Second) of Torts* § 283 (1965), there is no genuine dispute concerning whether or not Adrien's conduct in approving the UCRs in Tylena's and Latisha's case was negligent. Therefore, Adrien is immune from suit under the state law claims.

The City Defendants also contend that DeSevo and Trent are immune from suit under the state law claims based on New York State common law immunity as well as NYSSL § 419. Again, the Court will not address the City Defendants' arguments in support of this contention because, as explained below, the Court finds that the state law claims against DeSevo and Trent must be dismissed on independent grounds.

### 2. Personal Involvement in Alleged Conduct Underlying § 1983 Claims

The City Defendants also argue that Plaintiffs' § 1983 claims against the individual defendants in their personal capacity should be dismissed because those individuals were not personally involved in the alleged violations. Because the Court has determined that Adrien is immune from liability for Plaintiffs' § 1983 claims, the Court will consider this argument only as it relates to DeSevo and Trent.

 As explained by another court in this District,

> [i]n order to establish individual liability for a damages claim under 42 U.S.C. § 1983, a plaintiff must show that the defendant was 'personally involved' in the alleged constitutional deprivation.... Personal involvement of a supervisory official may be established by showing that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

*Shapiro v. Kronfeld,* No. 00 Civ.6286, 2004 WL 2698889, at *20 (S.D.N.Y. Nov.24,

---

the *Barnes* court, unlike the First Department in *Sean M.,* based this conclusion in part on its determination that the official conduct at issue in such cases is not discretionary for purposes of common law immunity. According to the Second Department, "[e]ven assuming that the decision to remove or not to remove a child from its parents is discretionary, once a determination has been made to

place the child in foster care, that commitment does not admit of 'different acceptable results' but must be accomplished in accordance with 'a governing rule or standard' of reasonable care.... [T]he discretion that a social worker exercises does not rise on a continuum of discretion to the level of a quasi-judicial act...." *Id.* at 830 (internal quotation marks and citation omitted).

2004) (citing *Al–Jundi v. Estate of Rocke-feller*, 885 F.2d 1060, 1065 (2d Cir.1989); *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986)) (further citations omitted).

 Plaintiffs contend that DeSevo was personally involved in the alleged violations because she was "assigned specifically to the plaintiffs' case" and was charged with carrying out the City's obligation to ensure their safety. (Pls.' Mem. at 21.) The fact that DeSevo was a supervisor assigned to Tylena's and Latisha's case, however, is not sufficient to create a genuine dispute as to whether she was personally involved in the alleged violations pursuant to the above criteria. Plaintiffs have not provided any evidence suggesting that DeSevo was informed of those violations prior to the children's removal from the Heathington home; that she created a policy or custom under which unconstitutional practices occurred or had any authority to alter existing policies; or that she was grossly negligent in supervising a subordinate who committed constitutional violations. Therefore, Plaintiffs have not met their burden to demonstrate a genuine factual dispute concerning whether DeSevo was personally involved in the alleged constitutional violations. Accordingly, the § 1983 claims against DeSevo in her personal capacity must be dismissed.

 Plaintiffs claim that Trent was personally involved in the alleged violations because she "was directly responsible for establishing the child welfare policies of the City." (Pls.' Mem. at 21.) Plaintiffs have not presented any evidence to support this claim. While there is no dispute that Trent held a position in CWA at some point during the period when Tylena and Latisha resided in the Heathington home, there is no evidence before the Court as to the precise nature, duration, or dates of her employment.[13] Moreover, Plaintiffs have not produced any evidence to show that Trent either personally established the allegedly unconstitutional policies or affirmatively approved them at any time. Nor have Plaintiffs presented any evidence that Trent was aware of those policies. "A defendant may not be held liable under Section 1983 merely because he or she holds a position of high authority." *Shapiro v. Kronfeld*, No. 00 Civ. 6286, 2004 WL 2698889, *20 (S.D.N.Y. Nov.24, 2004) (citing *Back v. Hastings On Hudson Union Free School Dist.*, 365 F.3d 107, 127 (2d Cir.2004); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir.1996)). Based on the record before the Court, even when considered in the light most favorable to Plaintiffs, it would be mere speculation, rather than a reasonable inference, to conclude that Trent was responsible for the promulgation of the policies and practices at issue, was otherwise aware of or acquiesced in their potentially harmful effects, or had the authority to alter them and failed to remedy the wrongs attributable to the policies or practices after being properly apprised. Accordingly, the City Defendants' motion for summary judgment as to Plaintiffs' § 1983 claims against Trent in her personal capacity is granted.

## C. *FAILURE TO FILE NOTICE OF CLAIM*

The City Defendants further argue that Plaintiffs' state law claims should be dis-

---

**13.** The only evidence before the Court that relates to these matters was submitted by the City Defendants and consists of a single letter dated September 18, 1989, written on the letterhead of the City Human Resources Administration, Special Services for Children, on which Trent is listed as "Deputy Commissioner." (*See* Ex. DD to Affidavit of Suzanne M. Halbardier dated Dec. 30, 2004.) In the Complaint, Plaintiffs claim that Trent was "director of the Child Welfare Administration ... during some of the material time period." (Complaint ¶ 13.) They have not adduced any evidence in support of this assertion.

missed on the grounds that Plaintiffs failed to comply with New York General Municipal Law (the "Municipal Law") § 50–i, which requires plaintiffs to serve the City with a "notice of claim" prior to filing a suit against it. *See* N.Y. Gen. Mun. L. § 50–i(1)(a) (McKinney 2005). "In any case founded upon tort, ... the notice of claim shall ... be served ... within ninety days after the claim arises." *Id.* at § 50–e(1)(a). The parties appear to agree that the ninety-day period began to run on August 5, 1991, when both Debra M. and the City first became aware of some of the facts underlying the instant claims.

■ Plaintiffs concede that they have not filed a notice of claim. They point out, however, that the Municipal Law creates an exception to the notice of claim requirement for "claims against public corporations by their own infant wards." *Id.* at § 50–e(8). The rationale for this exception is that "[w]here ... the prospective defendant (the city) and its own agency [are] the only parties reasonably situated to ascertain the existence of the claim and to prosecute the claim, it would be an idle gesture to require that they file a notice of claim against themselves." *Thomas v. New York City*, 814 F.Supp. 1139, 1154 (E.D.N.Y.1993) (quoting *Gibbs v. City of New York*, 23 A.D.2d 665, 257 N.Y.S.2d 242 (App.Div.2d Dep't.1965)) (internal quotation marks omitted).

■ The City Defendants argue that this rationale does not support application of the exception to the notice of claim requirement in the instant case because the City was not the only party reasonably situated to ascertain the existence of and prosecute the claims. Rather, according to the City Defendants, Debra M. also could have prosecuted the claims. In support of this contention, the City points out that Tylena and Latisha began residing with Debra M. on November 7, 1991. As-

suming that the instant claims accrued on August 5, 1991, though, Tylena and Latisha did not commence residing with Debra M. until a few days after the expiration of the ninety-day notice period. The City Defendants do not explain what legal right Debra M. would have had prior to November 7, 1991 (or after that date, until she adopted the children on June 14, 1995) to prosecute an action on their behalf. Thus, the record before the Court, which indicates that Tylena's and Latisha's sole guardian during the ninety-day notice period was the City, supports a finding that the criteria for application of the exception to the notice of claim requirement have been met. *See Thomas v. New York City*, 814 F.Supp. 1139, 1154 (E.D.N.Y.1993) ("[T]he infant plaintiffs were 'wards' of the defendants in the sense that no independent guardian was able to look after their interests beside the defendants themselves."). Accordingly, Plaintiffs' failure to file a notice of claim does not bar their claims based on state law.

## D. SOCIAL WORKER MALPRACTICE CLAIMS

■ The City Defendants argue that Plaintiffs' social worker malpractice claim against Adrien and DeSevo must be dismissed because they were not licensed social workers at the relevant time. Because the Court has found that Adrien is immune from suit under any state law claims, this argument must be addressed only insofar as it relates to DeSevo. In its Decision and Order addressing the Agency Defendants' motion for summary judgment, the Court concluded, based in part on the holding of the New York County Supreme Court in *Dunn v. Catholic Home Bureau for Dependent Children*, 142 Misc.2d 316, 537 N.Y.S.2d 742, 744 (N.Y.Sup.Ct.1989), that only licensed social workers may be held liable for social work malpractice in

New York State. Plaintiffs do not dispute the City Defendants' representation that Adrien and DeSevo are not licensed social workers. Accordingly, the Court's previous holding supports the dismissal of the social work malpractice claims against Adrien and DeSevo.[14]

### E. STATE LAW TORT CLAIM

As noted above, Plaintiffs' fourth cause of action, asserted against all Defendants, alleges that the City Defendants violated their duty to exercise the highest degree of reasonable care in supervising Tylena and Latisha. Again, neither party explicitly addresses this claim in their summary judgment papers. Nevertheless, because the City Defendants have moved for dismissal of all claims asserted against them, the Court will address this cause of action.

The Court interprets Plaintiffs' fourth cause of action to plead a common law tort against the City Defendants. As noted above, "liability may be imposed upon a state or its subdivisions for injuries sustained by children due to negligent oversight of the foster homes that care for them." *Sean M.*, 795 N.Y.S.2d at 550. In light of the Court's determination above that Adrien is protected by common law immunity against Plaintiffs' state law claims, the Court must address Plaintiffs' fourth cause of action only in relation to the City, DeSevo and Trent.

"By its waiver of governmental immunity, the State assumed liability for its conduct and consented to have such liability determined in accordance with the same rules of law applicable to individuals and corporations. As a concomitant of the State's waiver of immunity, the governmental subdivisions of the State its counties, cities, towns and villages ... also became 'answerable equally with individuals and private corporations for wrongs of officers and employees.'" *Florence v. Goldberg,* 44 N.Y.2d 189, 404 N.Y.S.2d 583, 375 N.E.2d 763, 766–766 (1978) (quoting *Bernardine v. City of New York,* 294 N.Y. 361, 62 N.E.2d 604, 605 (1945)). "A public corporation may be liable in tort where acts are done by its authority which would warrant a like action against an individual, provided the act is done by the authority and order of the governmental entity, or by some part invested with jurisdiction to act for the entity, upon the subject to which the particular act relates, or where, after the act has been done, it has been ratified by the governmental entity." 62 *N.Y. Jur.*2d Government Liability § 36 (2005) (citing *Herman v. Board of Education of Union School Dist. No. 8,* 234 N.Y. 196, 137 N.E. 24, 25 (1922) ("Boards of education have been held responsible for negligence when their own corporate act in the discharge of their corporate duties is the negligence complained of."); *Forbell v. City of New York,* 164 N.Y. 522, 58 N.E. 644 (1900)). In order to prove liability for negligence, a plaintiff must "demonstrate a breach of duty owed to plaintiff by defendant that proximately caused plaintiff's injuries." *La Fountain by La Fountain v. County of Clinton,* 237 A.D.2d 808, 654 N.Y.S.2d 870, 870–871 (App.Div. 3rd Dep't.

---

14. Plaintiffs state that they plan to seek reargument with respect to the Court's ruling on the Agency Defendants' summary judgment motion insofar as that ruling is based on the determination that a defendant may not be held liable for social work malpractice unless he or she is a licensed social worker. Pursuant to Local Civil Rule 6.3, however, "[a] notice of motion for reconsideration or re-argument of a court order determining a motion shall be served within ten (10) days after the entry of the court's determination of the original motion...." S.D.N.Y. Local Civ. R. 6.3. The challenged Order was entered on October 26, 2004. Plaintiffs have not offered any explanation for the delay in seeking reargument. Therefore, the Court declines to reconsider its prior ruling on this matter.

1997) (citing *Akins v. Glens Falls City School Dist.*, 53 N.Y.2d 325, 441 N.Y.S.2d 644, 424 N.E.2d 531 (1981)).

 As discussed above, Plaintiffs have presented some competent evidence tending to show that the alleged policy prohibiting City caseworkers from having direct contact with foster children and foster families derived from an official mandate. In addition, the City Defendants have not squarely denied that such a custom or policy existed. The Court also determined above that the record contains adequate evidence to support an inference that the custom or policy in question was sufficiently causally related to the alleged harms to sustain liability by the City. The City Defendants do not dispute that they owed Tylena and Latisha a duty of care. Accordingly, the Court finds that there is a triable issue of fact as to Plaintiffs' tort claim against the City.

The Court's prior conclusions also dispose of the City Defendants' motion as it relates to DeSevo and Trent. The Court has found that Plaintiffs have failed to meet their burden to come forward with sufficient evidence that DeSevo or Trent was personally involved in any actionable conduct. Although that determination followed from an analysis of the question of personal involvement in the § 1983 context, the Court finds that the criteria for personal involvement in conduct underlying a § 1983 claim apply equally here. Accordingly, the City Defendants' motion for summary judgment as to Plaintiffs' fourth cause of action insofar as it is asserted against DeSevo and Trent is granted.

## F. *PLAINTIFFS' RULE 11 MOTION*

Subsection (b) of Rule 11 requires attorneys and unrepresented parties to certify that any papers they submit to the court are not frivolous. Rule 11(c) provides for sanctions against parties who violate the requirements of subsection (b). " 'Even if the district court concludes that the assertion of a given claim violates Rule 11, … the decision whether or not to impose sanctions is a matter for the court's discretion.' Indeed, when determining whether sanctions are appropriate, a district court is obligated to exercise caution and restraint." *Kingvision Pay–Per–View Ltd. v. Ramierez*, No. 05 Civ.2778, 2005 WL 1785113, at *4 (S.D.N.Y. July 28, 2005) (quoting *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir.2004)) (further citations omitted).

Having reviewed Plaintiffs' papers in support of their Rule 11 motion, the Court finds that sanctions against the Agency Defendants and their attorneys are not warranted in this case. Accordingly, Plaintiffs' motion is denied.

## V. *ORDER*

For the reasons stated above, it is hereby

**ORDERED** that the motion (Docket Nos. 46, 50 and 66) of defendants the City of New York (the "City"), Vincent Adrien ("Adrien"), Marilyn DeSevo ("DeSevo"), and Brooke Trent ("Trent") (collectively, the "City Defendants") for summary judgment dismissing the claims of plaintiffs Tylena M. and Latisha M. ("Plaintiffs"), by their mother Debra M., is DENIED with respect to Plaintiffs' first cause of action insofar as it relates to the City and Adrien, DeSevo, and Trent in their respective official capacity, and insofar as it is based on the alleged violation of the Fourteenth Amendment to the United States Constitution; and it is further

**ORDERED** that the City Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' first cause of action insofar as it relates to Adrien, De-

Sevo and Trent in their individual capacity, and insofar as it is based on the alleged violation of the Fifth Amendment to the United States Constitution; and it is further

ORDERED that the City Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's second cause of action; and it is further

ORDERED that the City Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' third cause of action insofar as it relates to the City and Adrien, DeSevo and Trent in their respective official capacity, and insofar as it is based on the alleged violation of the Fourteenth Amendment to the United States Constitution; and it is further

ORDERED that the City Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' third cause of action insofar as it relates to Adrien, DeSevo and Trent in their individual capacity and insofar as it is based on the alleged violation of the Fourth Amendment to the United States Constitution; and it is further

ORDERED that the City Defendants' motion for summary judgment is DENIED with respect to Plaintiffs' fourth cause of action insofar as it relates to the City; and it is further

ORDERED that the City Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' fourth cause of action insofar as it relates to Adrien, DeSevo and Trent in their individual capacity; and it is further

ORDERED that the City Defendants' motion for summary judgment is GRANTED with respect to Plaintiffs' sixth cause of action; and it is finally

ORDERED that Plaintiffs' motion (Docket No. 54) pursuant to Fed.R.Civ.P. 11 and 8 U.S.C. § 1927 for sanctions against defendants Heartshare Children's Services, Eleanor Poole, and Rosalyn Chernofsky, and their attorneys, Murphy & Higgins, is DENIED.

**SO ORDERED.**