Samantha **RICHARDS**, and Samantha Richards as parent and next friend of Wydeia and Shanealya Richards, Plaintiff,

v.

THE CITY OF NEW YORK et al.; New York City Detectives Kevin McCann, Daniel Carmosin and Mike Paul; New York City Police Officer Mark Preiffer; Detectives/Police Officers John and Jane Doe; Assistant District At-

---

torneys Angela Domanski, Lee Trink, Julie Mendik, Heidi Mason, Ken Taub, and John and Jane Roe; Nicholas Scopetta, Individually and as Commissioner of Children's Services; Little Flower Children's Services of New York; Dorrence Henderson, individually as a case worker for Administration of Children's Services; Jason and Joan Doe, individually as case workers for Administration of Children's Services; Martin Weinberg, Donna Cerrio, Kojo Karikari and David Roper, individually and as Supervisors for Administration of Children's Services; Barbara Young, Colin Roach, Donna Degrasse, Carlos Pan, Susan Mote, Susan Puckey, Jessica Rose Carter, individually and as case workers for Little Flower Children's Services, Defendants.

No. 97 CIV. 7990(MBM).

United States District Court, S.D. New York.

June 15, 2006.

Michael L. Spiegel, Esq., Law Office of Michael L. Spiegel, New York, NY, for plaintiff Samantha Richards.

Lawrence A. Vogelman, Esq., Nixon, Raiche, Manning, Vogelman, & Leach, P.A., Manchester, NH, for plaintiff Samantha Richards.

Frederick H. Cohn, Esq., New York, NY, for plaintiffs Shanealya and Wydeia Richards.

Michael A. Cardozo, Stephen Kitzinger, Esq., (Assistant Corporation Counsel), New York City Law Department, New York, NY, Corporation Counsel of the City of New York.

Kristen G. Shea, Esq., Conway, Farrell, Curtin, & Kelly, P.C., New York, NY, for defendant Little Flower Children's Services of New York.

Suzanne M. Halbardier, Esq., Barry, McTiernan, & Moore, New York, NY, for defendant Administration of Children's Services.

## OPINION AND ORDER

MUKASEY, District Judge.

Samantha Richards ("Richards"), and her children Wydeia and Shanealya Richards (the "Children"), sue the City of New York and certain law enforcement personnel, including assistant district attorneys ("ADAs"), detectives, and police officers (collectively the "City of New York defendants"); the City of New York and case workers, supervisors, and the Commissioner of the Administration of Children's Services (collectively the "ACS defendants"); and Little Flower Children's Services of New York ("LFCS"), its case workers, and its supervisors (collectively the "LFCS defendants"). Plaintiffs allege that the City of New York defendants violated 42 U.S.C. § 1983 by arresting and prosecuting Richards without probable cause and by depriving Richards of the companionship and custody of her children. (Supp. Compl.¶¶ 41–73–87) Plaintiffs further allege that the ACS defendants and the LFCS defendants deprived the Children of their due process rights in violation of 42 U.S.C. § 1983 by failing to protect them from harm. (Supp.Compl.¶¶ 92–124) Finally, the plaintiffs allege a variety of state law claims against the defendants including breach of contract, social work malpractice, trespass upon the plaintiffs' persons, false arrest and imprisonment, intentional and negligent infliction of emotional distress, conversion of property, and conspiracy; they seek respondeat superior liability. (Supp.Compl.¶¶ 125–39)

Defendants McCann, Paul, and the City of New York renew their motion for summary judgment on Richards's § 1983 claims on the grounds that there was probable cause both to arrest and to prosecute Richards; there was reason to believe Richards had abused or neglected the Children and there was no custodian to care for the children after Richards was arrested, necessitating a referral to the Commissioner of Social Services; McCann and Paul are entitled to qualified immunity; and plaintiffs' state law claims for negligent and intentional infliction of emotional distress were not properly filed.

The ACS defendants move for summary judgment dismissing the § 1983 claims and any state law claims, alleging that there is no evidence to support such claims. Additionally, the individual ACS defendants seek dismissal of all claims against them because there is no evidence that they violated the Plaintiffs' civil rights and in any event they are entitled to qualified immunity.

The LFCS defendants argue that the § 1983 claims fail because plaintiffs cannot show LFCS was deliberately indifferent, that LFCS' actions were a substantial factor in bringing about the Children's injuries, or that LFCS had a policy or practice which resulted in the deprivation of the

Children's constitutional rights. Further, the LFCS defendants move for summary judgment on the breach of contract claim alleged against them, arguing that plaintiffs cannot show LFCS was deliberately indifferent or negligent in investigating or supervising the foster homes or the Children while they were in such foster homes. The LFCS defendants argue that the plaintiffs' social work malpractice claim fails because LFCS caseworkers Pan and Mote were not certified social workers and plaintiffs did not provide evidence that LFCS social worker Puckey deviated from a professional standard.

For the reasons set forth below, the defendants' motions for summary judgment are denied in part and granted in part.

## I.

The following facts, viewed in the light most favorable to Richards and the Children, are relevant to this opinion.

### A. Arrest and Prosecution of Richards

On September 11, 1995, at approximately 6:45 pm, Gersham O'Connor was shot and killed at 277 Eastern Parkway Apartment 4–F, Brooklyn, New York (the "Richards Home"), the apartment he shared with Richards and the Children. (Kitzinger Decl., Ex. A, ¶ 16) Richards and the Children were in the Richards Home at the time of O'Connor's shooting. (Kitzinger Decl., Ex. A, ¶ 16) Shortly after O'Connor was shot, Richards reported the shooting and Police Officers John McNamara, Mark Pfeiffer, Anthony Greco, and others responded to the Richards Home. (Kitzinger Decl., Ex. D, ¶ 2; Ex. E ¶ 3; Ex. F at 7–8)

After arriving on the scene, Greco observed Richards giving the Children's backpacks to her mother, Sheila Richards, and Greco took possession of the backpacks. (Kitzinger Decl., Ex. F at 26–27) Pfeffier then noticed that one of the backpacks taken by Greco contained a green leafy substance, which was sent to the New York Police Department ("NYPD") Laboratory and determined to be over two pounds of marijuana. (Kitzinger Decl., Ex. G; Ex. H; Ex. I) The police also recovered a .38 caliber revolver, together with five discharged .38 caliber shells from the Richards Home. (Kitzinger Decl., Ex. J)

At approximately 8 p.m. on the same day, McCann interviewed Maryland Sinclair and Conrad Davis at the 77th Precinct House (the "Station House"). (Kitzinger Decl., Ex. M; Ex. N) Sinclair stated that she heard four gunshots coming from the building in which the Richards Home was located and did not see anyone enter or leave the building. (Kitzinger Decl., Ex. N) Davis told McCann that he heard an argument followed by gunshots coming from the Richards Home and observed O'Connor bleeding from the neck. (Kitzinger Decl., Ex. M)

When interviewed at the Station House, Richards stated that a tall, skinny, black male with corn rows, bleeding from the chest, attempted to rob her and murdered O'Connor. (Kitzinger Decl., Ex. JJ ¶ 2) McCann and Paul checked the local hospitals for a man matching Richards's description, interviewing one man but excluding him as a suspect. (Kitzinger Decl., Ex. II at 90) They also showed Richards a photograph book but she was unable to identify the assailant. (Kitzinger Decl., Ex. II at 87–88)

On September 12, 1995, McCann and Paul took the Children from their grandmother's home to the Station House. (Children 56.1 Statement, Ex. 1 at 58–59) Wydeia stated that the police told her that she could see her mother if she told the

police that her mother shot O'Connor. (Children 56.1 Statement, Ex. 1 at 58–59) Wydeia was questioned at the Station House and stated that Richards shot O'Connor. (Kitzinger Decl., Ex. O) Wydeia denies ever having told anyone that Richards killed O'Connor, and does not remember her interviews by McCann or Paul. (Kitzinger Decl., Ex. GG at 47–63)

On September 13, 1995, ADAs Trink and Mendik, in the presence of McCann, interviewed Michael McNeil, who lived in the same building as the Richards Home. (Kitzinger Decl., Ex. P) McNeil stated that he heard arguing and then gunshots from the Richards Home on September 11. (Kitzinger Decl., Ex. P) McNeil said that the door to the Richards Home was very heavy, and audible when opened or closed, yet he did not hear the door open or close. (Kitzinger Decl., Ex. P) McNeil stated further that he saw Davis standing in the door of the Richards Home and Richards then opening the door and pulling Davis into the apartment. (Kitzinger Decl., Ex. P)

On September 13, 1995, Paul interviewed Andrea Johnson, who lived in the same building as the Richards Home. (Kitzinger Decl., Ex. Q) Johnson stated that on September 11 she was returning home from work when she saw Davis riding the elevator and then knocking on the door of the Richards home. (Kitzinger Decl., Ex. Q)

On September 13, 1995, McCann interviewed Kariaska Pilgrim, who lived in the same building as the Richards Home. (Kitzinger Decl., Ex. R) Pilgrim stated that as she exited the elevator she heard O'Connor and Richards arguing and then, within minutes, heard three to four gunshots. (Kitzinger Decl., Ex. R) Pilgrim stated also that she did not hear the door to the Richards home open or hear anyone in the hallway until the police arrived. (Kitzinger Decl., Ex. R) That same day, Detective Daniel Carmosin interviewed Pilgrim's roommate Marva St. Rose. (Kitzinger Decl., Ex. S) St. Rose stated that while she was in the basement of the building, she heard three gunshots. (Kitzinger Decl., Ex. S) After taking the elevator to the fourth floor, she observed that the Richards Home door was closed. (Kitzinger Decl., Ex. S)

On September 13, 1995, Richards was arrested without a warrant and charged with O'Connor's murder and with criminal possession of a weapon in the second degree. (Kitzinger Decl., Ex. A ¶ 24; Ex. T) On September 18, 1995, a grand jury indicted Richards on two counts of murder in the second degree and one count of criminal possession of a weapon in the second degree. (Kitzinger Decl., Ex. X at 38) On September 19, 1995, the grand jury indicted Richards on one count of criminal possession of a weapon in the fourth degree and one count of criminal possession of marijuana in the second degree. (Kitzinger Decl., Ex. Y; Ex. Z at 13)

In August 1996, Wydeia, while preparing for Richards's trial and upon being told to tell the truth by her foster mother, stated that Sheila Richards told her and Shanealya to say that O'Connor was shot by someone other than Richards, but that "mommy shot Gersh." (Kitzinger Decl., Ex. BB ¶¶ 2–4) On October 28, 1996, during Richards's trial, Richards's attorney, Arthur Lewis, stated to the Court that Wydeia told him she witnessed Richards shoot O'Connor. (Kitzinger Decl., Ex. CC at 619–620) On November 1, 1996, as part of a swearability hearing related to the murder case, Wydeia identified 277 Eastern Parkway as the building in which she lived with her "mother that killed my father." (Kitzinger Decl., Ex. DD at 1088) That same day, Wydeia testified that a man killed O'Connor. (Kitzinger Decl.,

Ex. DD at 1098–99) She stated also that she lied each time she said that Richards killed O'Connor and that she lied for no reason. (Kitzinger Decl., Ex. DD at 1149–50)

On October 28, 1996, McCann testified that neither he nor any officer spoke with the Children on September 11, 1995. (Vogelman Decl., Ex. 1 at 974–75) McCann said that after he "started to feel that Samantha was the suspect" he interviewed the Children at the Station House separately out of the presence of Richards, because he "wanted the children to feel that they could speak to me." (Vogelman Decl., Ex. 1 at 967–77; Ex. 2 at 144) This interview was tape recorded and McCann testified that neither he nor any other officer spoke with the Children about the incident at any other time, including when he and Paul were in the car alone with the Children. (Vogelman Decl., Ex. 1 at 977, 1052; Ex. 2 at 133–36) No ADA was present during McCann's interview with either child. (Vogelman Decl., Ex. 2 at 141–42)

On November 4, 1996, all charges against Richards were dismissed. (Kitzinger Decl., Ex. A ¶ 28) Richards filed a notice of claim on July 4, 1997, alleging false arrest, false imprisonment, malicious prosecution, and the violation of her civil rights pursuant to 42 U.S.C. §§ 1981 and 1983. (Kitzinger Decl., Ex. C) She commenced this suit on October 28, 1997. (Kitzinger Decl., Ex. C)

During his deposition on January 13, 1999, Greco stated that he overheard Wydeia telling Sheila Richards that "a man with long dreads was fighting with [O'Connor] and [O'Connor] and the man had guns and that the man shot [O'Connor] in the kitchen and chased him into the bathroom." (Cohn Decl., Ex. 6 at 10–11) Although Greco does not remember who he informed about Wydeia's comment to her grandmother, he did inform a detective on the scene about the statement. (Cohn Decl., Ex. 6 at 13–14)

On September 9, 2002, Wydeia declared that Richards did not kill O'Connor and that the "police made me tell them that she did." (Kitzinger Decl., Ex. FF ¶ 2) In her August 16, 2004 deposition, Wydeia testified that she never told anyone Richards killed O'Connor and did not recall any statements she made to McCann or Paul. (Kitzinger Decl., Ex. GG at 47–56, 59–63) She testified also that a uniformed officer questioned her about whether her mother killed O'Connor on the night of the murder and that officer was either McCann or Paul. (Kitzinger Decl., Ex. GG at 47–48, 54–55) She stated that "the cops . . . told me if I said that my mother shot Gersham, that I would be able to see her." (Kitzinger Decl., Ex. GG at 58) Further, Wydeia testified that she never spoke to Sheila Richards about O'Connor's murder. (Kitzinger Decl., Ex. GG at 51) Richards declared that she "never attempted to influence my children . . . to change their testimony" and that, to her knowledge, "Sheila Richards did not attempt to influence my children to change their testimony at any time." (Kitzinger Decl., Ex. JJ ¶¶ 3–4)

B. **Placement of the Children in Foster Care**

On the day of Richards's arrest, the New York City Child Welfare Administration, now known as the Administration for Children's Services ("ACS"), took the Children into custody and placed them in foster care. (Kitzinger Decl., Ex. A ¶ 25) On September 14, 1995, ACS filed a petition in the Family Court of the State of New York alleging that Richards abused the Children because she (1) shot and killed O'Connor in the Children's presence; (2) had a loaded weapon together with spent and live ammunition in the home; (3)

placed marijuana in the Children's backpacks to conceal drugs from the police; and (4) had not taken Wydeia for treatment for ringworm. (Kitzinger Decl., Ex. U) On that date, the Family Court remanded the Children to the custody of the Commissioner of Social Services. On December 14, 1995, ACS successfully petitioned to have the Children declared abused and neglected and, on May 31, 1996, the Family Court affirmed that Richards had abused the Children for the four reasons stated by ACS. (Kitzinger Decl., Ex. AA at 18–19; Halbardier Decl., Ex. E at FC 14–15, FC 27–28) Temporary custody of the Children was granted to the Commissioner of Social Services, and they were placed in a foster home with Monique Jones. (Halbardier Decl., E at FC 12–13, FC 33)

LFCS had a contract with ACS to provide foster care services from 1995 through 1999. (Children Supp. 56.1 Statement, Ex. 28 at UF 400) The contract included a provision that ACS would "have final administrative authority over all placement decisions and [would] refer all children for placement." (Children Supp. 56.1 Statement, Ex. 25 at 15) Additionally, the contract stated that "the Commissioner ha[d] the ultimate responsibility for the protection and preservation of the welfare of each Child receiving Services under the Agreement ... [and] further recognized ... that the Commissioner ha[d] the ultimate authority for making such decisions relative to the welfare of such child, including but not limited to, all case planning and dispositional decisions, and that the management and supervisory staff of [ACS] carries out such responsibilities on behalf of the Commissioner." (Children Supp. 56.1 Statement, Ex. 25 at 28)

Soon after ACS gained custody of the Children, it investigated placing them with Sheila Richards. (Halbardier Decl., Ex. E at FC 33) After visiting Sheila Richards's apartment, LFCS caseworkers and the Children's Law Guardian's social worker determined that it was too small. (Halbardier Decl., Ex. C at 25, 27–28; Halbardier Decl., Ex. E at FC 33–35) On March 12, 1996, the Family Court held that a placement with Sheila Richards was unsuitable, because the apartment was too small, particularly in light of the fact that Sheila Richards's 12 year old son, Wydeia's 21 year old "uncle," and Wydeia's "grandad" also lived there. (Halbardier Decl., Ex. C at 25, 27–28; Ex. H at 227) A maternal aunt's home, a small studio that the aunt shared with a young son, was determined also to be too small. (Halbardier Decl., Ex. F at 191)

The Children were in the Jones home from September 13, 1995 through January 3, 1997. (Children Supp. 56.1 Statement, Ex. 1) During those 16 months, neither child attended school despite previous enrollment in a pre-school program and Wydeia having been registered for school. (Nov. 16, 2005 Cohn Decl., Ex. 3 at 36) It is alleged that while at the Jones home, the Children were beaten, fed table scraps, forced to sleep in the boiler room, and kept filthy and ill clothed. (Nov. 16, 2005 Cohn Decl., Ex. 1 at 140–151; Shea Decl., Ex. U at 184–86, 188–189; Ex. V at 48–49)

Jones was a certified foster care provider and an independent contract provider of foster care services for LFCS. (Shea Decl., Ex. E at 42, 53; Ex. F at LFFP 517–522) Before LFCS licensed Jones, it reviewed her application, inspected her home, interviewed her, checked references, checked her record with the State Central Register, and obtained her medical reports. (Shea Decl., Ex. E at 16, 29–30, 38–41; Ex. F at LFFP 456–59, 470–76) Jones attended foster care training classes, during which she was provided with written materials and informed that

corporal punishment was forbidden, food could not be withheld as a form of punishment, and it was her responsibility to clothe the children and enroll them in school. (Shea Decl., Ex. E at 23–28; Ex. F at LFFP 550) The Foster Boarding Home Agreement between Jones and LFCS reiterates Jones's responsibilities, including her duty to provide food of sufficient quality and quantity, arrange for the Children's attendance at school, keep a sufficient quantity of clean fitted clothing, and avoid using corporal punishment. (Shea Decl., Ex. E at 43–44; Ex. F at LFFP 517, 520) Jones was given a copy of the LFCS Foster Parent Manual, which stated that corporal punishment was forbidden, the children must be properly fed, and the children's attendance at school was to be encouraged. (Shea Decl., Ex. E at 45, 47, 49–50; Ex. G) LFCS re-certified Jones's home annually; as part of the re-certification, LFCS inspected the Jones home and interviewed her. (Shea Decl., Ex. E at 64–67; Ex. F LFFP 530–35, 539–44; Ex. H at 58–59)

While in foster care, the Children's care was supervised by LFCS. Under New York state regulations, LFCS was required to file a Uniform Case Report ("UCR") with ACS every six months regarding the Children's health and the services being provided to them. 18 N.Y.C.R.R. § 428.3(f)(6). (Halbardier Decl., Ex. A ¶ 94; ACS Rule 56.1 Statement ¶¶ 18–26) ACS caseworkers also met with the Children and the foster family while they were in foster care. (Halbardier Decl., Ex. E at 92, 146, 172–73, 189–92, 205–06, 306–07, 310–11, 432)

On January 30, 1996, during a family court hearing, Sheila Richards alleged that Jones was beating the Children. (Halbardier Decl., Ex. E at FC 33–34) On March 12, 1996, the Family Court was advised by the Children's Law Guardian that a case-worker "didn't find anything to corroborate [the accusation of abuse] and the children are very happy there" and "are okay." (Halbardier Decl., Ex. C at 27; Ex. E at FC 35)

As of March 1996, ACS and LFCS had notice that the Children were suffering from post-traumatic stress disorder. (Children Supp. 56.1 Statement, Ex. 5) Additionally, LFCS submitted UCRs to ACS regarding the Jones foster home, which stated the children "still are not attending school because the foster mother does not have the immunization records and birth certificates," "Shanealya was diagnosed with post-traumatic stress disorder," and "Wydeia has some behavior problems but she'll start school in September 1996." (Children Supp. 56.1 Statement, Ex. 5, 6)

On May 31, 1996, Sheila Richards alleged that Wydeia informed her that Jones beat her. (Halbardier Decl., Ex. E at FC 35–36) ACS investigated the matter and, on September 6, 1996, deemed the allegation of mistreatment unfounded. (Halbardier Decl., Ex. E at FC 36)

The August 1996 UCR stated that the Children were both "doing well" and have a "good relationship" with Jones. (ACS Reply Mem., Ex. H at ACS 227) At that time, Shanealya was attending the Special Kids Intervention Program, where she "receives proper therapy" for her Post Traumatic Stress Disorder and other developmental disorders. (ACS Reply Mem., Ex. H at ACS 227)

At LFCS's request, all visitation between the Children and Richards or Sheila Richards was terminated between September 6, 1996 and December 3, 1996. (Nov. 16, 2005 Cohn Decl., Ex. 10C at ACS 541; Shea Decl., Ex. L at FC 36–37) In a telephone call on November 4, 1996, Jones told the LFCS staff that the Children had not "been in school since in her care."

(Children Supp. 56.1 Statement, Ex. 7) LFCS caseworkers were regularly forced to wait for some period of time before being admitted to the Jones home for unannounced visits. (Children Supp. 56.1 Statement, Ex. 10)

On November 22, 1996, LFCS records show that Jones, when confronted with her landlord's allegation that she had not paid rent, "had no explanation why the landlady would lie ... [and] had no credible explanation as to why she relocated 3 times since her home has been opened." (Children Supp. 56.1 Statement, Ex. 11) Jones also provided conflicting information about her husband/fiancé, who was never cleared as part of the original home study. (Children Supp. 56.1 Statement, Ex. 11) Further, the police were called to the Jones home regarding a dispute between Jones and her landlord. (Children Supp. 56.1 Statement, Ex. 11) On December 2, 1996, LFCS personnel met with Jones's landlord, who stated that "the Jones have made threats against him, his wife, and his children ... the Jones do not come in with the children until 2–3 a.m.[,] he usually smell [sic] the stench of marijuana from the apartment." (Children Supp. 56.1 Statement, Ex. 11) That day, LFCS called the state hotline to report Jones's educational neglect, but the report was refused because LFCS could not specify how many school days had been missed (Children Supp. 56.1 Statement, Ex. 11) On December 9, 1996, Jones's landlord informed LFCS that the police were called to the home due to another altercation. (Children Supp. 56.1 Statement, Ex. 11)

On December 10, 1996, LFCS sent Jones a Notice for Removal of Children from a Foster Home, stating that the Children would be placed in another home because Jones was not meeting the Children's educational needs and failed to provide personal information for her husband.

(Nov. 16, 2005 Cohn Decl., Ex. 16 at LFCR 1737) On January 3, 1997, the Children were immediately removed from the Jones home after they arrived to a meeting at LFCS dirty and wearing unkempt clothes. (Children Supp. 56.1 Statement, Ex. 12) Later, Shanealya testified that she told Richards that Jones was "good," because Jones instructed the Children to tell Richards that or else Jones would hurt them. (Nov. 16, 2005 Cohn Decl., Ex. 17 at 27–29)

On February 13, 1997, ACS received notice that the charges brought against Richards had been dismissed. (Children Supp. 56.1 Statement, Ex. 13)

The Children were placed with their maternal great aunt, Christina Cassbury, on March 4, 1997, but Cassbury returned the Children to ACS custody on April 3, 1997. (Halbardier Decl., Ex. F at 473; Halbardier Decl., Ex. E at FC 23–26, FC 39)

In April 1997, the Children were placed in the home of Latanya Roman where they remained for more than one year. (Children Supp. 56.1 Statement, Ex. 1) Roman was a certified foster care provider since 1994, and an independent contract foster care provider for LFCS. (Shea Decl., Ex. X at 60–61, 173; Ex. W at LFFP 2, 85–90) Her home was visited and investigated several times by an LFCS worker, she was interviewed, and LFCS prepared a home study report on Roman. (Shea Decl., Ex. X at 23–24, 27, 46–49; Ex. W at LFFP 18–21, 32–42) Roman submitted medical reports, financial information, a birth certificate, her divorce decree, and letters of reference; she was cleared by the State Central Register for no prior reports of abuse or neglect of children. (Shea Decl., Ex. X at 33–35, 54–55; Ex. W at LFFP 9–11, 63, 69–71, 101–108) Roman attended foster care classes, was given written materials, received the LFCS Foster Parent Manual, and spoke with an LFCS worker

during her home study interview about her responsibility to clothe and bathe the children. (Shea Decl., Ex. G; Ex. X at 23–24, 32, 49–51, 56–57, 61–63; Ex. W at LFFP 39) LFCS recertified Roman every year. As part of that process, Roman's home was inspected, she was interviewed, and she had to attend training, including a class titled "Preventing Child Abuse and Maltreatment." (Shea Decl., Ex. Z at 73–74, 129–130, 133, 137, 141, 144)

While in the Roman home, the Children were assigned to caseworker Mote, who was on maternity leave for five months. (Nov. 16, 1996 Cohn Decl., Ex. 28 at 86) Plaintiffs allege that during these five months, the Children were seen only once by an LFCS caseworker. (Nov. 16, 1996 Cohn Decl., Ex. 29 at 42) However, LFCS provides documents to establish that between April 1997 and September 1997, a LFCS supervisor, caseworker, or nurse saw the Children twelve times, six of which were in the foster home. (Shea Decl., Ex. X at 105, 114, 169, 1904–05, 1910–1911, 1917, 1919; Ex. I at LFCR 935, 965; Ex. D at LFCR 126, 330, 337–39, 342, 1344, 135–, 1473)

Thereafter, the Children were assigned to caseworker Jessica Rose Carter, who was untrained as a social worker. (Children 56.1 Statement, Ex. 16 at 17–18) Roman failed to bring the Children to visits and did not attend school meetings; the Children had poor hygiene and improperly fitting clothes. (Children Supp. 56.1 Statement, Ex. 19) Carter told her supervisor about Roman's uncooperativeness; the supervisor advised Carter to bring the Children to visits with their mother or doctor's appointments herself. (Children Supp. 56.1 Statement, Ex. 21 at 73) During the 10 months the Children were under Roman's care, they saw a LFCS caseworker, supervisor, or nurse 28 times, 10 of which were in the foster home, and they were

seen six times by medical or mental health personnel. (Shea Decl., Ex. X at 91–92, 105, 114, 168; Ex. I LFCR 180–81, 188, 203, 312, 321, 935, 965, 1169, 1171, 1183, 1528–29, 1531, 1627, 1637, 1904–05, 1910–11, 1917, 1919; Ex. D at LFCR 117, 126, 330, 337–38, 342, 352, 1344, 1350–52, 1469–70, 1473; Ex. Z at LFCR 1891, 1893, 1896, 1899, 1924, 2303, 2309, 2329, 2332, 2343, 2347, 2351, 2358, 2356)

On February 26, 1998, Roman informed LFCS that she wanted the Children removed from her home. (Shea Decl., Ex. X at 125; Ex. Z at LFCR 2323) On March 14, 1998, Roman submitted this request in writing. (Shea Decl., Ex. N at LFCR 1768) On March 18, 1998, a school nurse wrote to the Children's caseworker to complain of the lack of hygiene and inappropriate and filthy clothing for Wydeia as well as Roman's over-all uncooperativeness with the school. (Nov. 16, 1996 Cohn Decl., Ex. 32) On March 24, 1998, LFCS removed the children from the Roman home. (Shea Decl., Ex. N at LFCR 969–973)

In October 1998, the Children were placed in a therapeutic foster home. (Children Supp. 56.1 Statement, Ex. 24) The Children remained in foster care until they were returned to Richards in December 1999. (Children Supp. 56.1 Statement, Ex. 1)

## II.

Plaintiffs assert multiple claims against all of the defendants under 42 U.S.C. § 1983 alleging violations of their constitutional rights, as well as tort and contract claims under New York state law. The City of New York defendants, the ACS defendants, and the LFCS defendants move separately for summary judgment on the claims brought against them.

A. The § 1983 Claims against the City of New York Defendants

The City of New York defendants renew their motion for summary judgment under Fed.R.Civ.P. 56(b) dismissing the plaintiffs' § 1983 claims for false arrest, malicious prosecution, and wrongful removal of the Children from Richards's custody.[1] This court denied summary judgment on those claims in an opinion and order filed on May 7, 2003 (the "Opinion"). *See Richards v. City of New York*, No. 97 Civ. 9770, 2003 WL 21036365 (S.D.N.Y. May 7, 2003). The City of New York defendants argue first that they cannot be held liable for Richards's arrest, her malicious prosecution, and wrongful removal of the Children because they had probable cause to support all three actions. In the alternative, McCann and Paul argue that their conduct is protected by qualified immunity.

1. Probable Cause

The determinations in the Opinion constitute the law of the case. The law of the case doctrine requires a court to "adhere to [its] own decision at an earlier stage of the litigation unless there are cogent or compelling reasons not to, such as an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *New York State Nat'l Org. for Women v. Terry*, 961 F.2d 390, 395–96 (2d Cir.1992) (citations and internal quotation marks omitted); *United States v. Thorn*, 446 F.3d 378 (2d Cir.2006); 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478, at 788 (1981)

("Law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit."). No such reason is presented here.

The City of New York defendants argue that *Savino v. The City of New York*, 331 F.3d 63, (2d Cir.2003) changes or otherwise modifies or clarifies the law upon which the court's prior decision was based. I disagree.

In *Savino*, the Second Circuit held that the collective knowledge doctrine, which "provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all," may not "be used to impute bad faith to one member of an enforcement team on the basis of another member's knowledge." 331 F.3d at 74 (internal quotation marks omitted). In the Opinion, the collective knowledge doctrine was not applied, either to assist officers in establishing probable cause or to impute bad faith to one officer on the basis of another's knowledge, nor does *Savino* announce a change in the controlling law. *See, e.g., United States v. Valez*, 796 F.2d 24, 28 (2d Cir.1986).

The Opinion relied on concepts of circumstantial evidence to determine that there were material issues of fact as to whether the New York City defendants had probable cause to arrest and prosecute Richards. The Opinion stated:

---

**1.** The claims brought against ADA Grossblatt were previously dismissed, as were claims brought against the remainder of the ADA defendants to the extent that plaintiffs seek to hold them liable for actions taken in the course of, or in close connection with, the judicial phase of the criminal case against Richards. *Richards v. City of New York*, No.

97 Civ. 7990, 1998 WL 567842, at *4 (S.D.N.Y. Sept.3, 1998). The ADA defendants' motion was denied to the extent the plaintiffs seek to hold them liable for supervising, participating with, and assisting the police in their investigation of O'Connor's murder. *Id.*

Faced with Wydeia's statement exculpating Richards, and assuming as I must at this stage that all other facts would be interpreted in the light most favorable to plaintiffs, a reasonable juror could conclude that defendants lacked probable cause to arrest and prosecute Richards .... [S]ummary judgment for either party is inappropriate here because there is a substantial gap between the parties' accounts of the circumstances surrounding Wydeia's two critical statements. On the one hand, the plaintiffs suggest that Wydeia's statement to her grandmother exculpating Richards was a spontaneous statement made outside Richards' presence only minutes after the shooting, and was therefore reliable. Defendants, on the other hand, insinuate that Richards, who had already stuffed marijuana in her daughter's bag, instructed Wydeia to lie to the police and to tell her grandmother a story consistent with her own. A jury must evaluate the reliability of Wydeia's statement to her grandmother in context and determine, based on that evaluation, whether defendants reasonably believed that Richards killed O'Connor at the time of the arrest and the indictment.

*Richards,* 2003 WL 21036365, at *17. I did not find that because Greco overheard Wydeia's statement exculpating her mother, such knowledge would be imputed onto the defendants who arrested and prosecuted her. Rather, I found that because of Greco's deposition testimony in which he reported Wydeia's statement to a detective at the crime scene the evening of O'Connor's murder, there are genuine issues of fact as to what the New York City defendants actually knew at the time Richards was arrested and whether such information was provided to the prosecutor.[2] (*See* Greco Dep. at 21)

In denying summary judgment on the malicious prosecution claims in the Opinion, I relied on the plaintiffs' presentation of evidence that "Greco's memo book, in which he recorded eyewitness testimony and other testimony exculpating Richards, was not in the District Attorney's case file" and "Greco's own deposition testimony that Greco shared the contents of his memo book with another police officer and perhaps with McCann," in determining that plaintiffs had "offered evidence to support the inference that police officers withheld material information from the District Attorney" and, thus, overcoming the presumption of probable cause created by the indictment.[3] *Richards,* 2003 WL 21036365, at *14. Absent that presumption, "there are genuine issues of fact with respect to probable cause that preclude summary judgment on either the false arrest claim or the malicious prosecution claim." *Richards,* 2003 WL 21036365 at *15. Again, the collective knowledge doctrine does not change this analysis.

The new evidence that the City of New York defendants present is Wydeia's 2004

---

**2.** Probable cause to arrest is determined based on what the officer knew at the time of the arrest. *Jocks v. Tavernier,* 316 F.3d 128, 135 (2d Cir.2003).

**3.** The elements of a malicious prosecution claim under New York law are: (1) the defendant commenced or continued a criminal proceeding against the plaintiff, (2) that proceeding ended in the plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant maliciously initiated the criminal proceeding. *See Bernard v. United States,* 25 F.3d 98, 104 (2d Cir.1994). A Grand Jury indictment creates a presumption that the arrest and indictment were procured with probable cause; to rebut such a presumption the plaintiff must show the indictment "was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id.* (internal quotation marks omitted).

deposition, in which she stated that she never told anyone that Richards killed O'Connor; does not recall any statements she made to McCann or Paul; recalls that a uniformed officer questioned her about whether her mother killed O'Connor on the night of the murder and that person was McCann or Paul; and recalls that "the cops ... told me if I said that my mother shot Gersham, that I would be able to see her." (Kitzinger Decl. Ex. GG at 47–56, 58–63) None of these statements bear on whether Greco did or did not inform those responsible for Richards's arrest and prosecution about Wydeia's statement that someone other than her mother shot O'Connor, and thus are irrelevant for present purposes.

Further, neither *Savino* nor any statements made in Wydeia's 2004 deposition alter this court's analysis regarding Plaintiffs' claim that Wydeia's statement that Richards shot O'Connor was coerced. Wydeia's statement during that deposition that "the cops ... told me if I said that my mother shot Gersham, that I would be able to see her" supports plaintiffs' position that such a statement was coerced. (Kitzinger Decl. Ex. GG at 58) Further, as explained in the Opinion, this court based its determination that an issue of material fact exists as to whether Wydeia's statement was coerced on

> evidence in the record that Detectives McCann and Paul, who interviewed Wydeia and Shanealya on September 12, spoke to the children before the audio tape began. At the end of the transcript of her recorded interview, Shanealya told the detectives that there was a man in the apartment on the night of the shooting. When Shanealya stated that she did not know what the man looked like, an officer responded: 'Didn't you say what his hair look like?' No explanation has been provided for the officer's reference to a prior conversation.

*Richards,* 2003 WL 21036365, at *18. As I found before, it is possible that a reasonable juror, with evidence that statements by the Children incriminating Richards were drawn from an incomplete transcript, could discount those statements.

Finally, the City of New York defendants do not show that there is a "clear error" or "manifest injustice" that must be corrected. Thus, as I found in 2003, the New York City defendants are not entitled to summary judgment dismissing the § 1983 claims brought against them based upon their arguments relating to probable cause.

Further, any state law claims brought against the New York City defendants for false arrest and malicious prosecution will not be dismissed. The elements for a claim of false arrest or malicious prosecution under New York law are the same as those required to assert a federal claim; thus, as explained above and in the Opinion, plaintiffs have met that burden at this stage. *See Lee v. City of New York,* 272 A.D.2d 586, 709 N.Y.S.2d 102 (2d Dept. 2000) (false arrest); *O'Donnell v. County of Nassau,* 7 A.D.3d 590, 775 N.Y.S.2d 902 (2d Dept.2004).

### 2. Qualified Immunity

In the alternative, McCann and Paul argue that they are entitled to qualified immunity, because reasonably competent police officers could disagree as to whether there was probable cause to arrest and prosecute Richards as well as to place the Children in ACS custody. (City of New York Mem. of Law at 22) Specifically, they argue that the statements by Johnson, McNeil, Sinclair, and Davis, along with the physical evidence found in the Richards Home, was sufficient evidence such that, even if it did not constitute probable cause to arrest and prosecute, reasonably compe-

tent police officers could disagree as to whether there was probable cause to arrest.

In response, Richards argues that no reasonable police officer could believe that perjury, coercing children into falsely implicating their mother in a homicide, and withholding exculpatory evidence is appropriate police conduct. (Richards Mem. of Law at 9) I take care in reviewing accusations, like those made here, that police officers and detectives have lied and fabricated evidence; while the accusations may not ultimately be sustained, "[l]ying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appear to endorse such official misconduct, which would weaken the public's respect for the administration of justice." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir.1997).

■ Under the doctrine of qualified immunity, police officers will not be subjected to personal liability for damages when their official conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, . . . insofar as it was objectively reasonable for such officials to believe, even if mistakenly, that their conduct did not violate such rights." *Id.* at 127 (citation and internal quotation marks omitted) The availability of the defense depends on whether a "reasonable officer could have believed" his action "to be lawful, in light of clearly established law and the information he possessed." *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

■ An officer is shielded by qualified immunity from a false arrest claim when "(1) it was objectively reasonable for the officer to believe there was probable cause to make the arrest, or (2) reasonably competent police officers could disagree as to whether there was probable cause to arrest." *Ricciuti*, 124 F.3d at 128. An officer has probable cause to arrest when a prudent person in possession of the facts the officer knew of at the time of the arrest would believe the suspect had committed and or was committing a criminal act. *See id.* The Second Circuit recently held that "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest . . . . [W]e focus on the validity of the *arrest,* and not on the validity of each charge." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir.2006). Finally, the analysis ends when it is determined that the police officer had a reasonable basis for believing there is probable cause; there is no requirement to "explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti*, 124 F.3d at 128.

■ As the focus is on the validity of the arrest and not the validity of each charge, there was a reasonable basis for the officers to believe there was probable cause to arrest Richards. At the time of the crime, the police found over two pounds of marijuana and a weapon with live and spent ammunition—evidence that criminal statutes were violated. Additionally, before arresting Richards, McCann and Paul investigated her claims that O'Connor was "murdered by a light-skinned, black male with corn rows," but they were unable to find anyone who matched her description after searching area hospitals for such a man. The police are not required to believe a suspect's version of the events, nor are they "required to explore and eliminate every theo-

retically plausible claim of innocence before making an arrest." *Id.; see also Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir.1989) (factfinder determines whether defendant's story holds up, not the arresting officer). Several residents of the building in which the Richards Home was located told police that they overheard Richards and O'Connor arguing minutes before gunshots rang out and that they did not see or hear anyone enter or exit the Richards Home; although this evidence is contradicted by the account of the one witness to the shooting, six-year-old Wydeia, the apparent force of the evidence was such that "reasonably competent police officers could disagree as to whether there was probable cause to arrest." *Ricciuti*, 124 F.3d at 128. Thus, under the circumstances, McCann and Paul had a reasonable basis for believing there was probable cause, even if such probable cause did not actually exist, and are entitled to qualified immunity in the arrest of Richards.

■■■ In evaluating a malicious prosecution claim, a court must consider whether, under New York law, (1) the defendant commenced or continued a criminal proceeding against the plaintiff, (2) that proceeding ended in the plaintiff's favor, (3) there was no probable cause for the criminal proceeding, and (4) the defendant maliciously initiated the criminal proceeding.[4] *See Bernard v. United States*, 25 F.3d 98, 104 (2d Cir.1994). Thus, I must determine whether a reasonable law enforcement officer could think it was lawful to charge Richards with a crime. *See Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir.1994). It is undisputed that the defendants commenced a criminal proceeding against Richards and that the proceeding ended in

her favor when the charges were dismissed on the prosecutor's motion.

A genuine issue of material fact exists as to whether a reasonable law enforcement officer could think it was lawful to charge Richards with a crime, as the City of New York defendants and the plaintiffs sharply contest what occurred during the investigation and subsequent prosecution of Richards. Viewing the evidence in the light most favorable to the plaintiffs, a reasonable jury could find that McCann or another detective or police officer knew of Wydeia's statement to her grandmother that someone other than Richards shot O'Connor, but nonetheless arrested Richards and failed to tell the District Attorney about Wydeia's account. Further, a reasonable jury could find that Wydeia was truthful in her statement that she was told by a detective or police officer that she could see her mother if she said that her mother had killed O'Connor. Such a jury could conclude from the transcript of Shanealya's interview that the Children were interviewed and perhaps coerced into inculpating their mother by the City of New York defendants before the taped portion of the interview took place. A reasonable juror, believing plaintiffs' version of the relevant events, could find that Richards was prosecuted out of malicious intent, as evidenced by the allegedly coerced statements from Richards's young children. Because a reasonable jury could find against McCann and Paul on this issue, a genuine issue of material fact exists with respect to it. *compare Weyant v. Okst*, 101 F.3d 845, 858 (finding facts sharply in dispute and that the matter of qualified immunity could not be resolved as a matter of law) *with Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995) (asserting that when the

---

**4.** Although § 1983 provides the federal claim, the elements of the underlying malicious prosecution tort are borrowed from state law.

*See Cook v. Sheldon*, 41 F.3d 73, 79 (2d Cir. 1994).

factual record is not in serious dispute, the ultimate legal determination of qualified immunity is a question of law left for the court to decide). It is for the jury at trial to determine whether plaintiffs have proved their serious charges.

■ Finally, for McCann and Paul to establish qualified immunity as to the removal of the Children, they must show that it was objectively reasonable for them to believe that they violated no federal rights in exercising control over the Children at the time of Richards's arrest. It is a clearly established "that a parent's interest in the custody of his or her children [is] a constitutionally protected 'liberty' of which he or she could not be deprived without due process, which would generally require a pre-deprivation hearing." *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987). However, an officer may deprive a parent of temporary custody in "emergency circumstances" without parental consent or a prior court order. *Id.* An emergency circumstance is present if a child is "immediately threatened with harm or is bereft of adequate care or supervision." *Id.*

After the officers arrested Richards, the Children were bereft of adequate care or supervision as Richards is their only parent and legal guardian and the only adult who lived in the Richards Home with the Children. Plaintiffs do not proffer another adult who could have provided adequate care and supervision for the Children at the time Richards was arrested. Moreover, the day after Richards's arrest, the Family Court remanded the children to the custody of the state (Kitzinger Decl. Ex. U) and three months after that date the Family Court declared that the Children were abused and neglected by Richards. (Kitzinger Decl. Ex. AA at 18–19) Thus, a court proceeding was held regarding the deprivation of custody the day

after the Children were seized, and three months later a formal hearing was held; this falls within the ambit of "temporary custody." Emergency circumstances were present such that it was objectively reasonable for McCann and Paul to believe that they violated no federal rights in taking the Children into temporary custody without Richards's consent or a prior court order, and McCann and Paul are shielded by the qualified immunity doctrine.

The § 1983 and state law claims against the City of New York relating to Richards's arrest and prosecution as well as to the removal of the Children, are not dismissed, nor are the § 1983 claims brought against McCann and Paul for malicious prosecution. The § 1983 claims brought against McCann and Paul for false arrest and removal of the Children are dismissed based on the qualified immunity doctrine.

**B. Loss of Consortium Claim under § 1983**

The plaintiffs have agreed in writing to dismiss the Seventh Cause of Action, which asserted that the ACS defendants and the LFCS defendants violated the due process rights of the plaintiffs by not placing the Children in the kinship foster home of Sheila Richards. (ACS Reply Mem. at 1) Thus, I need not address the arguments presented as to that claim.

**C. The § 1983 Claims against ACS Defendants and LFCS Defendants**

The ACS and LFCS defendants seek summary judgment on the plaintiffs' claim that they violated the Children's constitutional rights by failing to protect the Children from harm. These defendants argue that ACS investigated all allegations of harm brought to its attention and all such allegations were deemed unfounded. The ACS and LFCS defendants seek summary judgement also on the claim that ACS and

LFCS failed to adequately train their employees. Finally, the individual ACS defendants seek dismissal of all claims against them, because there is no evidence that they violated the constitutional rights of the plaintiffs and they are entitled to qualified immunity.

In their briefs, plaintiffs argue that the Children's return to Richards's care was delayed because ACS did not inform the Family Court judge that Richards was no longer incarcerated, thereby violating their substantive due process rights. Such a claim was not asserted in the Supplemental Complaint; thus it is dismissed as improperly pleaded. *See Cantor Fitzgerald v. Lutnick,* 313 F.3d 704, 711 n. 3 (2d Cir.2002) (finding that where a claim is first raised in a reply brief the court need not consider it); *Beckman v. United States Postal Serv.,* 79 F.Supp.2d 394, 407 (S.D.N.Y.2000) (finding that plaintiff cannot raise new claims in submissions in opposition to a summary judgment motion). (Kitzinger Decl., Ex. A)

### 1. Failure To Adequately Supervise and Protect the Children

The Children assert that ACS and LFCS were indifferent to the conditions in two of the foster homes in which the Children were placed, and failed to protect the children even when they knew that the Children were beaten, not properly dressed and groomed, not attending school, and not receiving proper therapy. (Children's Memo. of Law at 13) In response, the ACS and LFCS defendants argue not only that they adequately supervised the Children and trained their employees, but also that the plaintiffs have not identified specific employees who allegedly deprived the Children of their constitutional rights. (ACS Reply Mem. at 1)

### a. Violation of a Constitutional Right

A § 1983 claim lies against any "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any ... person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983.

Government officials may be liable under § 1983 for acts as well as omissions; thus, "[w]hen individuals are placed in custody or under the care of the government, their governmental custodians are sometimes charged with affirmative duties, the nonfeasance of which may violate the constitution." *Doe v. New York City Dep't of Soc. Serv.,* 649 F.2d 134, 141 (2d Cir.1981). Particularly, "children in foster care [have] a substantive due process right [under the Fourteenth Amendment] to protection from harm." *Tylena M. v. Heartshare Children's Services,* 390 F.Supp.2d 296, 302 (S.D.N.Y.2005) (quoting *Marisol A. v. Giuliani,* 929 F.Supp. 662, 675 (S.D.N.Y. 1996) (internal quotation marks omitted)). This right to be free from harm includes the right to essentials of care such as adequate food, shelter, clothing, and medical attention. *See Youngberg v. Romeo,* 457 U.S. 307, 324, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982); *Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005).

Thus, the plaintiffs' allegations that they were physically abused as well as improperly clothed and fed suggests violations of a constitutional right that can give rise to a § 1983 action. However, plaintiffs claims that their constitutional rights were violated because the Children were not enrolled in school or placed in a therapeutic foster home cannot stand.

Although it is disgraceful that ACS and LFCS did not ensure children in their custody were properly and promptly enrolled in school, "[t]he Fourteenth Amend-

ment does not protect a public education as a substantive fundamental right." *Handberry v. Thompson*, 436 F.3d 52, 70 (2d Cir.2006) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) ("Education, of course, is not among the rights afforded explicit protection under our Federal Constitution.")). Thus, no § 1983 liability exist based on that conduct because a constitutional right was not violated.

"Courts generally agree that the Fourteenth Amendment does not require the state to provide children in foster care with an optimal level of care or treatment." *Marisol A. v. Giuliani*, 929 F.Supp. 662, 675 (S.D.N.Y.1996) (citing *Baby Neal v. Casey*, 821 F.Supp. 320, 337 (E.D.Pa.1993); *Del A. v. Roemer*, 777 F.Supp. 1297, 1319–20 (E.D.La.1991); and *B.H. v. Johnson*, 715 F.Supp. 1387, 1397–98 (N.D.Ill.1989)). Further, "[t]he due process clause is not a guarantee against incorrect or ill advised [government] decisions." *Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 144 (2d Cir.1994). To make a claim for a failure to provide an individual in custody with proper medical care, such as therapy, the plaintiff must prove "deliberate indifference to [her] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As to prisoner health care, the Second Circuit has found that "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to a [constitutional] violation." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir.1998).

ACS and LFCS did not deny the Children mental health treatment for Post Traumatic Stress Disorder or other developmental disorders; they provided treatments alternative to placing the Children in a therapeutic foster boarding home. The Uniform Case Reports ("UCRs") provided by LFCS to ACS referenced the mental health diagnoses of the Children and the treatment followed in response to such diagnoses. In February 1996, the UCR approved by ACS states that the Children "are showing some signs of emotional trauma from witnessing the shooting. Both children will be referred for therapy after psychological evaluations are completed." (Halbardier Decl., Ex. F at 205) The UCR submitted in August 1996 states that "Shanealya, after being evaluated, was diagnosed with Post Traumatic Stress Disorder and Developmental Disorders ... Shanealya currently attends SKIP, 'Special Kids Intervention Program,' where she receives proper therapy. Wydeia has some behavior problems but she'll start school in September 1996." (Halbardier Decl., Ex. F at 227) The January 1997 UCR states that the Children were removed from the Jones home and "ACS recommends that ... [the] children take counseling." (Halbardier Decl., Ex. F at 499) The September 1997 UCR advises ACS that Shanealya was evaluated psychologically on May 7, 1997 and psychiatrically on April 25, 1997,and was diagnosed with Post Traumatic Stress Disorder and that she was being placed in special education classes. (Halbardier Decl., Ex. F at 1460) Although the treatment provided may not have been as effective as placement in a therapeutic boarding home, that treatment did not violate the Children's constitutional rights. A § 1983 claim based upon a claim that it did cannot stand.

b. Failure To Perform An Affirmative Constitutional Duty

██ For a government custodian, such as one charged with supervising the placement of foster children, to be held liable

under § 1983 for failing to perform its affirmative duties to one in its custody, two requirements must be met: (1) "the omissions must have been a substantial factor leading to the denial of a constitutionally protected liberty or property interest"; and (2) "the officials in charge of the agency being sued must have displayed a mental state of 'deliberate indifference' in order to 'meaningfully be termed culpable' under § 1983." *Doe*, 649 F.2d at 141 (*quoting Turpin v. Mailet*, 579 F.2d 152, 166 (2d Cir.1978)).

An agency's alleged failure to supervise is a substantial factor leading to the denial of a foster child's constitutional right to be protected from harm when, had the agency "investigated [the child's] case with sufficient acuity and diligence to discover the abuse, it would have been able to prevent further abuse by withdrawing her from the home." *Id.* at 144. The ACS and LFCS defendants would be liable for abuse of the Children if they had "actual knowledge of a specific harm" or if the agencies, or their top supervisory personnel, "exhibited deliberate indifference to a known injury, a known risk, or a specific duty, and their failure to perform the duty or act to ameliorate the risk or injury was a proximate cause of plaintiff's deprivation of rights under the Constitution." *Id.* at 145. An agency demonstrates deliberate indifference that supports a failure-to-supervise claim if it "should have known that inadequate ... supervision was 'so likely to result in the violation of constitutional rights, that [they] ... can reasonably be said to have been deliberately indifferent to the need.'" *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992) (*quoting City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)).

Even though ACS delegated to LFCS the responsibility for the provision of foster care services, ACS is responsible for ensuring that children in its custody receive adequate care and protection from harm. *Tylena M.*, 390 F.Supp.2d at 304; *see Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir.2004) ("[A]llowing delegation, without more, to defeat municipal liability would contravene the remedial purposes of § 1983."). Further, under the contract between ACS and LFCS that delegates to LFCS responsibility to provide foster care services, ACS retains ultimate responsibility for the Children.

Thus, whether the ACS defendants and LFCS defendants violated the Children's § 1983 civil rights turns on whether ACS and LFCS acted with "deliberate indifference." Ordinary negligence is not in itself deliberate indifference, but "repeated acts of negligence [can] be evidence of indifference." *Doe*, 649 F.2d at 143. An indifference is deliberate when a policymaker "made a 'deliberate choice ... from among various alternatives.'" *Walker*, 974 F.2d at 297 (*quoting City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197). However, deliberate indifference does not require "ill-will or the affirmative acquiescence in mistreatment." *Doe*, 649 F.2d at 144. Deliberate indifference can exist in conjunction with either a "known injury" or a "known risk, or a specific duty," *Id.* at 145; thus, liability exists "regardless of whether [the municipality] was aware of the specific deprivations while they were being administered by subordinates." *Id.*

In *Tylena M.*, the Court found a § 1983 violation based upon a failure to supervise children in foster care where the caseworkers had no direct contact with the children and there were "observable signs of ... abuse that City workers could have detected had they had or been open to any direct contact with the children." 390 F.Supp.2d at 308–09. In *Lynn by Julie B.*

*v. St. Anne Instit.*, No. 03–cv–1333, 2006 WL 516796, 2006 U.S. Dist. LEXIS 18786 (N.D.N.Y. Mar. 2, 2006), the Court found no § 1983 violation despite failure to supervise a foster child, and because there was no evidence that the defendants knew or reasonably should have known of the abuse, because the child did not disclose the abuse which had no physical manifestations before she was removed from the foster care placement. *Id.* at *8, 2006 U.S. Dist. LEXIS 18786 at *25. Thus, to make out a § 1983 claim based on the failure to supervise, the Children must show "that the need for more or better supervision to protect against constitutional violations was obvious, but that [the defendants] made no meaningful attempt to forestall or prevent the unconstitutional conduct." *Amnesty Am.*, 361 F.3d at 127. The Children must present evidence that the defendants had reason to know of the potential risk to the Children; for example, evidence of a failure to respond to past complaints or incidents of abuse, or evidence of a physician's report that was ignored by government employees. *See Amnesty Am.*, 361 F.3d at 128. Broad allegations of a failure to visit the Children with sufficient frequency are not enough to sustain a § 1983 claim based upon a failure to supervise and protect the Children from harm. *Lynn*, 2006 WL 516796, at *10, 2006 U.S. Dist. LEXIS 18786, at *34.

Although the actions of Jones and Roman while serving as the Children's foster parents were wholly unacceptable, neither ACS nor LFCS was deliberately indifferent to a known injury or risk of injury from which they needed to protect the Children. The evidence presented to this court shows that both ACS and LFCS monitored the Children's placement in foster care and investigated the two claims of abuse brought to their attention.

The Richards family twice brought allegations of abuse to the attention of the Family Court judge, ACS, and LFCS. First, Sheila Richards alleged that Jones was beating the Children; the social worker for the Children's Law Guardian investigated these claims. (Halbardier Decl., Ex. E at FC 33–34) On May 12, 1996, the social worker appointed by the Children's Law Guardian reported to the Family Court that she found the Children "very happy" in their foster home and that there was no evidence to corroborate allegations of mistreatment. (Halbardier Decl., Ex. C at 27, Ex. E at FC 35) An LFCS caseworker also investigated and reported the "children are okay." (Halbardier Decl., Ex. C at 27, Ex. E at FC 035) On May 31, 1996, Sheila Richards again told the Family Court judge that the Children were wearing ill fitting clothing and being beaten by Jones. (Halbardier Decl., Ex. D at 21–25) That Judge directed an investigation; both the ACS Office of Confidential Investigation and the Law Guardian's social worker investigated, and both concluded there was no basis to substantiate the allegations. (Halbardier Decl., Ex. F at 306–07, Ex. E at FC 36) There is no evidence in the record that any other instances of physical abuse were made known to ACS.

Within a month of receiving information from Jones's landlord that Jones was in arrears on her rent, exhibited threatening behavior that required police intervention, kept the children out all night, and that the smell of marijuana came from the Jones apartment, LFCS sent Jones a written notice that it was removing the Children from her care. (Children Supp. 56.1 Statement, Ex. 11, 12) Shortly thereafter, LFCS immediately removed the Children from the Jones home when they arrived at LFCS dirty and wearing unkempt clothing. (Children Supp. 56.1 Statement, Ex. 12) Further, the Children

were removed from the Roman home once it came to LFCS' attention that a school nurse noticed Wydeia's lack of hygiene and inappropriate clothing. Although LFCS caseworkers were regularly forced to wait before being admitted to the Jones foster home for unannounced visits, which should have led to further investigation into the care being provided to the Children, this failure to investigate does not by itself constitute deliberate indifference. (Children Supp. 56.1 Statement, Ex. 10)

While the Children were in foster care, LFCS provided UCRs to ACS every six months documenting contacts with the foster children, the foster parents, and the foster home. (ACS Rule 56.1 Statement ¶¶ 19–27) ACS employees from the Child Protective Services unit had direct contact with the Children during the time they were in foster care. (ACS Rule 56.1 Statement ¶ 28) During the 10 months the Children were under Roman's care, they saw a LFCS caseworker, supervisor, or nurse 28 times, 10 of which were in the foster home, and they were seen by medical or mental health personnel six times. (Shea Decl., Ex. X at 91–92, 105, 114, 168; Ex. I at LFCR 180–81, 188, 203, 312, 321, 935, 965, 1169, 1171, 1183, 1528–29, 1531, 1627, 1637, 1904–05, 1910–11, 1917, 1919; Ex. D at LFCR 117, 126, 330, 337–38, 342, 352, 1344, 1350–52, 1469–70, 1473; Ex. Z at LFCR 1891, 1893, 1896, 1899, 1924, 2303, 2309, 2329, 2332, 2343, 2347, 2351, 2358, 2356)

Finally, both Jones and Roman were certified foster care providers with LFCS; their applications, homes, references, state criminal and medical records, and personal dispositions had all been inspected by LFCS. (Shea Decl., Ex. E at 16, 29–30, 38–41; Ex. F at LFFP 456–59, 470–76) Both attended training classes and received written materials repeatedly instructing them that corporal punishment was forbid-den, food could not be withheld, and the children had to be properly clothed; thus the need to provide these two foster parents with additional supervision was not obvious to ACS and LFCS because they had passed all of the required background checks and attended all the required training. In light of Jones's and Roman's training, the investigations of all reported incidences of physical abuse, the continuous contact between ACS, LFCS, and the Children, and the immediate removal of the Children upon notice that the Children were unbathed and ill-clothed, the plaintiffs have not presented evidence that the ACS defendants and LFCS defendants were deliberately indifferent in supervising the foster homes and the Children.

Even if the plaintiffs could establish deliberate indifference, they cannot make the required demonstration that there is a dispute concerning whether the municipality's policies were "a substantial factor leading to the denial" of the civil rights of the individuals in its custody. *Doe*, 649 F.2d at 141 (citing *Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)). For deliberate indifference to be a substantial factor in the violation of a constitutional right under § 1983, the policy at issue must be "closely related to the ultimate injury," and it must appear that the injury could have been avoided had the policy not been "deficient in the identified respect." *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197. "In order for the City's policies to have been causally related to the alleged abuse, it must first be demonstrated that the abuse had been occurring and known or objectively manifest to the agency or reasonably discoverable by the City for a sufficiently long period of time before the children were removed ... such that closer monitoring of the placement by the City prior to that date could have detected the alleged abuse." *Tylena M.*, 390 F.Supp.2d at 308. Further, supervisors do not pos-

sess the requisite mental state of deliberate indifference when the children are placed with "a trained and licensed foster care provider, [who] was not listed in the Central Register, and had no criminal record." *Park v. City of New York,* No. 99 Civ. 2981, 2003 WL 133232, at *15 (S.D.N.Y. Jan.16, 2003).

As discussed above, the alleged abuse reported by the Richards family was twice investigated and twice deemed unfounded by ACS, the Children's Law Guardian's social worker, and the Family Court judge. Once LFCS was alerted that Jones was having problems with her landlord and the Children arrived at LFCS dirty and in unkempt clothing, they were removed from the Jones home. Additionally, after a school nurse reported that Wydeia exhibited poor hygiene and inappropriate clothing, the Children were removed from the Roman home. Any prior abuse was not known or manifest to the agency, nor was it reasonably discoverable by the City for a sufficiently long period.

Thus, the § 1983 claims brought against ACS LFCS based upon a failure to supervise are dismissed.

### c. Claims Against the Individual ACS and LFCS Defendants

 The individual defendants argue that the claims against them must be dismissed because they are protected by qualified immunity. The individual defendants so contend because they argue that they acted appropriately when investigating complaints of mistreatment and concluding they were unfounded, and they followed the care and services being provided to the children through reports from LFCS and direct contact with the family and in court. Further, the individual defendants argue that the Children have not shown that any of the individual defendants were personally involved in the alleged constitutional violations. Commissioner of ACS Nicholas Scoppetta argues the claims against him must be dismissed because he was not personally involved in the case.

As explained above, "[t]he privilege of qualified immunity generally shields government officials from liability for damages on account of their performance of discretionary official functions 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Ying Jing Gan v. City of New York,* 996 F.2d 522, 531 (2d Cir.1993) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Summary judgment is also available when, even if a plaintiff's federal right was clear at the time of the official acts, "it was objectively reasonable for the official to believe that his acts did not violate those rights." *Id.* (internal citation and quotation marks omitted). Finally, "[b]ecause the defense of qualified immunity is designed to relieve government officials of the burdens of litigation as well as the threat of damages, summary judgment is encouraged as a device for disposing of claims barred by qualified immunity." *Id.* Qualified immunity is particularly important in cases involving child welfare "to insure that publicly employed caseworkers have adequate latitude to exercise their professional judgment in matters of child welfare." *Defore v. Premore,* 86 F.3d 48, 50 (2d Cir.1996). Thus, if it was reasonable for the ACS and LFCS defendants to have believed that it was lawful for them to leave the Children in the custody of Jones and Roman until the time when they were removed, qualified immunity will bar the claims brought against them.

Because no reasonable juror could find that it was objectively unreasonable for the ACS and LFCS employees to rely on

the statements made by the Children as reported in the UCRs, their visual inspection of the Children during each visit, and the investigations conducted in response to Sheila Richards's two allegations of mistreatment, the ACS and LFCS caseworker and supervisor defendants are immune from suit under § 1983 based on qualified immunity.

■ As to Scoppetta, the record is insufficient to show whether he had knowledge of the Children's condition sufficient to support liability based on any lack of supervision on his part. "[S]upervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on respondeat superior." *Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003). "To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting that a defendant in a § 1983 action may not be held liable for constitutional violations merely because he held a high position of authority). Thus, for liability to exist under § 1983 for someone in a supervisory position who does not directly participate in the constitutional violation, that person must have (1) failed "to remedy a wrong after being informed through a report or appeal," (2) created a policy or custom "that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue," (3) was "grossly negligent" in supervising "subordinates who committed a violation," or (4) failed "to act on information

indicating that unconstitutional acts were occurring." *Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Giaccio v. The City of New York,* No. 04 Civ. 3652, 2005 WL 95733, at *7, 2005 U.S. Dist. LEXIS 642, at *23–24 (S.D.N.Y. Jan. 19, 2005).

Plaintiffs provide no evidence that Scoppetta participated in any constitutional violation, was informed of any of the wrongs alleged by plaintiffs, created or allowed a policy or custom amounting to a constitutional violation,[5] negligently supervised his subordinates, or failed to act on information indicating that unconstitutional acts were occurring. His contractual responsibility to protect and preserve the welfare of the Children has no bearing upon an analysis of liability for a constitutional violation under § 1983; thus, the § 1983 claim brought against Scoppetta for failing to protect the Children from harm by failing to provide adequate supervision is dismissed.

### 2. Inadequate Training Claim

■ The Children argue that of all those involved in their care, only Jessica Rose Carter, an LFCS caseworker, received inadequate training. (Children Memo. of Law at 24) Carter was assigned to the Richards's case on her first day of employment, had no training as a social worker prior to taking on that case, and received all of her training while she was working as a caseworker, with most of her training done by her colleagues. (Children 56.1 Statement, Ex. 16 at 17–18)

The Supreme Court established in *City of Canton* that a municipality can be liable

5. The terms of the *Marisol* Settlement Agreement specifically prohibit the use of the "Advisory Report on Family Permanency Issues" or any other report created as a part of that case "as an admission against the City in any

civil, criminal or administrative action or proceeding; nor shall these matters be offered or received in evidence against the City ...." (ACS Reply Mem., Ex. G ¶ 50)

for inadequately training its employees where the municipality is deliberately indifferent toward whether its employees will unconstitutionally apply its policies without more training. 489 U.S. at 387–90, 109 S.Ct. 1197. The plaintiffs must offer evidence "as to the purported inadequacies in the [municipality's] training programs and the causal relationship between those inadequacies and the alleged constitutional violations." *Amnesty Am.*, 361 F.3d at 129. The deficiency in the training program must be "closely related to the ultimate injury," such that it "actually caused" the violation of constitutional rights. *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197. Further, plaintiffs "must establish that the officer's shortcomings resulted from a faulty training program rather than from the negligent administration of a sound program or other unrelated circumstances." *Amnesty Am.*, 361 F.3d at 129–30 (internal quotation marks omitted). To do this, plaintiffs must provide evidence as to when the municipality's training programs were conducted, how they were conducted, whether better or different training could have prevented the conduct, and how "a hypothetically well-trained officer would have acted under the circumstances." *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197.

Under *Walker*, plaintiffs must meet a three-pronged test to prove that a municipality's failure to train or supervise constitutes deliberate indifference. 974 F.2d at 297. First, the municipal policymakers must know "to a moral certainty" that their employees will confront a particular fact pattern that could cause harm. *Id.* Second, the fact pattern the employee faces must present a "difficult choice" that training or supervision will make easier or as to which there is a history of poor performance among employees. *Id.* Third, the failure of the employee to properly address the facts will frequently result in the deprivation of constitutional rights. *Id.* at 298. A fact pattern presents a "difficult choice" when it either (1) requires more than common sense to be handled or (2) presents the employee with "powerful incentives to make the wrong choice." *Id.* at 297, 300 (finding a police department does not need to train officers not to commit perjury because department could reasonably rely on officers' common sense unless the "policymakers were aware of a pattern of perjury by police officers but failed to institute appropriate training or supervision").

Here, plaintiffs provide no evidence as to when ACS or LFCS conducted training programs, how they were conducted, whether better or different training could have prevented the conduct, or how "a hypothetically well-trained officer would have acted under the circumstances." *City of Canton*, 489 U.S. at 391, 109 S.Ct. 1197. They provide no evidence as to any of the three prongs of the *Walker* test; all plaintiffs allege is that a single caseworker was not trained as a social worker before taking on the Richards case but was trained while on the job. This alone does not support a claim under § 1983 based upon inadequacy of training. Further, there is no evidence that ACS or LFCS had information that should have triggered a consideration of alternatives other than the training the department already gave. "[T]he simple recitation that there was a failure to train municipal employees does not suffice to allege that a municipal custom or policy caused the plaintiff's injury. A single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir.1993); *see also City of Canton*, 489 U.S. at 390–91, 109 S.Ct. 1197 ("That a

particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program .... It may be, for example, that an otherwise sound program has occasionally been negligently administered."). Therefore, the § 1983 claims brought against the ACS and LFCS defendants regarding inadequate training are dismissed.

## D. Breach of Contract Claim

■ The plaintiffs bring a breach of contract claim against LFCS, alleging that LFCS breached its contract with ACS to protect children in its care from abuse, maltreatment, and neglect, thereby injuring the Children. (Shea Decl. Ex. A, Supp. Compl. ¶¶ 125–131) There can be no dispute that the Children are the third party beneficiaries of the contract between ACS and LFCS; they are the people for whom the delegated services are to be provided. *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir.1991) ("New York law follows the Restatement (Second) of Contracts § 302[ ] in allowing a third party to enforce a contract if that third party is an intended beneficiary of the contract."). However, LFCS's liability to the Children is not increased simply because it is providing the Children with foster care services pursuant to a contract. Plaintiffs proffer no evidence that LFCS owes ACS any duty under the contract that is not the subject of a corresponding duty LFCS owes to the Children or that LFCS undertook a higher duty of care than ACS had to the Children under the contract. Thus, plaintiffs' breach of contract claim is repetitive of their other claims against ACS and LFCS and is dismissed for the reasons discussed above.

## E. Social Work Malpractice Claims

■ The tort of "social work malpractice" exists in a skeletal form under New York law; it is discussed in one New York Supreme Court opinion and one Southern District of New York opinion. I need not determine whether such a tort in fact exists under New York law, because plaintiffs' social work malpractice claim would, under the tort thus far developed, fail.

In *Dunn v. Catholic Home Bureau for Dependent Children*, 142 Misc.2d 316, 537 N.Y.S.2d 742 (N.Y.Sup.1989), the Court held that a licensed social worker is liable for social work malpractice if she practices her "profession fraudulently, incompetently or negligently." *Id.* at 318, 537 N.Y.S.2d 742. As only licensed social workers may be held liable for social work malpractice in New York State, and plaintiffs do not dispute that Pan and Mote were not licensed social workers, the social work malpractice claims against Pan and Mote are dismissed. *See Tylena M.*, 390 F.Supp.2d at 316–17. Plaintiffs have presented no evidence that Puckey practiced her profession fraudulently, incompetently, or negligently. Thus, LFCS's summary judgment motion as to the social work malpractice claims filed against Pan, Mote, and Puckey is granted.

## F. Remaining State Law Claims Against All Defendants

The plaintiffs allege various state-law tort claims against all of the defendants. The defendants move for summary judgment on all of the state law claims brought against them.

New York notice-of-claim rules govern claims before this court based upon New York law. *See Felder v. Casey*, 487 U.S. 131, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (applying Wisconsin notice of claim procedures to state-law claims brought alongside § 1983 claims in a district court in Wisconsin). Under New York law, a

plaintiff bringing a tort claim against a city or its officers must file a notice of claim within 90 days of the event upon which the claim is based and must commence the action within one year and 90 days from the date the cause of action accrues. N.Y. Gen. Mun. Law §§ 50–e, 50(i)(a) (McKinney 2001); *see, e.g., Ramashwar v. Espinoza,* No. 05 Civ. 2021, 2006 WL 36752, at *7 (S.D.N.Y. Jan. 6, 2006); *Lieber v. Village of Spring Valley,* 40 F.Supp.2d 525, 533 (S.D.N.Y.1999). "A complaint that fails to allege compliance with General Municipal Law § 50–i is legally insufficient and must be dismissed." *Melito v. Canastota Central School Sys.,* 192 A.D.2d 754, 755, 596 N.Y.S.2d 182 (3d Dept.1993).

Although plaintiffs do not address in their reply papers defendants' argument that plaintiffs failed to file a notice of claim, the plaintiffs' Supplemental Complaint filed in June 2003 states "[a] Notice of Claim has been duly made and served in compliance with the General Municipal Law. By order filed August 22, 1997, Index No. 112182/97, New York County, Hon. Lewis R. Friedman, in the matter of *Samantha Richards v. The City of New York,* plaintiff Samantha Richards was granted leave to file a late Notice of Claim." (Kitzinger Decl., Ex. B, Supp. Compl. ¶ 135) It is permissible for a court to "extend the time to serve a notice of claim," N.Y. Gen. Mun. Law § 50–e(5), thus plaintiffs state-law claims for false arrest, false imprisonment, and malicious prosecution against the City of New York and the New York City Police Department stand as discussed above. (Kitzinger Decl. Ex. C, Richards Notice of Claim at 1) However, the Notice of Claim filed by plaintiffs does not state a claim for negli-

gent or intentional infliction of emotional distress. Accordingly, that claim as brought against the City of New York and its officers, including the ACS and its officers, is dismissed.[6]

Additionally, all state-law claims brought against the ACS and LFCS defendants are dismissed. Despite plaintiffs' statements to the contrary in the Children's reply brief, the Supplemental Complaint does not allege that any actions by the ACS or LFCS defendants underlay any state-law claims other than those previously discussed, nor does that complaint even name any of the ACS or LFCS defendants in its descriptions of the actionable conduct. (Kitzinger Decl., Ex. B Supp. Compl. ¶¶ 134–139)

\* \* \* \* \* \*

For the reasons stated above, defendants' motions for summary judgment are granted in part and denied in part. The following claims are dismissed: (1) the § 1983 claims filed against McCann and Paul regarding the arrest of Richards and the removal of the Children from her custody; (2) the § 1983 claims filed against the ACS and LFCS defendants; (3) the breach of contract claim filed against LFCS; (4) the social work malpractice claims against Pan, Mote, and Puckey; (5) the negligent and intentional infliction of emotional distress claims against the City of New York and ACS defendants; and (6) all other state-law claims against the ACS and LFCS defendants. As to other claims and/or defendants, the motions are denied.

SO ORDERED.

---

**6.** Plaintiffs state that although their claims against ACS were not made until the time to file a notice of claim had passed, their "state law claims against ACS are viable pursuant to the contract between ACS and Little Flower."

(Children Supp. Mem. at 18 n. 2) Plaintiffs cite no authority to support this proposition and this court does not find any; thus the claim is dismissed against ACS and its employees.